UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TODD NISHON, JAMES CAPPS, JOSEPH VAILLANCOURT, HARRY HILBURG, RAYMOND DYNNE III, and WILLIAM SIMMONS, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>FORD MOTOR COMPANY, a Delaware Limited Liability Company,<br><br>　　　　　　　　Defendant. | Case No.<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................ 1

II.   JURISDICTION ...................................................................... 15

III.  VENUE ..................................................................................... 16

IV.   PARTIES ................................................................................. 16

    A.    Plaintiffs ........................................................................ 16

        1.    Todd Nishon (California) ....................................... 16

        2.    James Capps (Arizona) ......................................... 20

        3.    Joseph Vaillancourt (Arizona) .............................. 22

        4.    Harry Hilburg (Missouri) ...................................... 23

        5.    Raymond Dyne III (Nebraska) .............................. 25

        6.    William Simmons (Wisconsin) .............................. 27

V.    FACTUAL ALLEGATIONS ................................................... 28

    A.    Ford Marketed The Stall/Fire Risk Vehicles as Safe,
        Reliable, And Fuel-Efficient, And Ford Knew That These
        Attributes Were Material To Consumers .......................... 28

    B.    Ford Marketed The Stall/Fire Risk Vehicles As Fuel-
        Efficient And Ford Knew This Attribute Was .................. 36

    C.    Plaintiffs And Class Members Paid Thousands Of Dollars
        For The Stall/Fire Risk Vehicles Because They Thought The
        Vehicles Were Safe, Reliable, And Fuel-Efficient .......................... 40

    D.    Ford's Vehicle Warranties ................................................ 41

    E.    The Spontaneous Stall/Fire Risk ...................................... 43

        1.    The March 2022 Recall .......................................... 44

2.      The July 2022 Recall ............................................................. 47

3.      The June 2023 Recall .............................................................. 51

4.      Permanent Damage Caused by the Failed 2022 Recall .......... 54

F.      Ford Knew Or Should Have Known Of The Spontaneous
        Stall/Fire Risk Before It Disclosed The Risk To Plaintiffs .............. 56

        1.      Ford's durability testing should have uncovered the
                Spontaneous Stall/Fire Risk. ................................................... 56

        2.      Ford knew about the Spontaneous Stall/Fire Risk
                from warranty claims for Stall/Fire Risk Vehicles and
                its own investigation. .............................................................. 58

G.      After Instituting The "Fix," Ford Failed To Conduct New
        Mileage Tests To Ensure That Its Mileage Estimates Were
        Not Adversely Affected ...................................................................... 61

H.      After Instituting The "Fix," Ford Failed To Conduct Tests
        To Ensure That Durability And Longevity Were Not
        Adversely Affected By The Perforated Engine Undershield ........... 63

I.      Class Members Could Have Been Made Aware Of The
        Spontaneous Stall/Fire Risk At The Point Of Sale ........................... 65

VI.     TOLLING OF THE STATUTE OF LIMITATIONS ................................. 65

A.      Discovery Rule Tolling ...................................................................... 65

B.      Estoppel ............................................................................................. 66

VII.    CLASS ALLEGATIONS ........................................................................... 67

VIII.   CLAIMS .................................................................................................... 71

A.      Nationwide Claims ............................................................................ 71

COUNT I     VIOLATION OF THE MAGNUSON-MOSS
            WARRANTY ACT (15 U.S.C. § 2301, *et seq*.) ............................. 71

COUNT II    FRAUDULENT CONCEALMENT (Common Law) ................... 77

COUNT III   UNJUST ENRICHMENT (Common Law) .................................. 82

      B.    State-Specific Claims ....................................................... 84

          1.    California ...................................................... 84

COUNT IV   VIOLATION OF THE CALIFORNIA CONSUMER
LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) .......... 84

COUNT V   VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) ............ 88

COUNT VI   VIOLATIONS OF CALIFORNIA FALSE
ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500,
et seq.) ............................................................ 91

COUNT VII   VIOLATION OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY UNDER
CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)............. 93

          2.    Arizona ...................................................... 97

COUNT VIII VIOLATIONS OF THE CONSUMER FRAUD ACT
(Ariz. Rev. Stat. § 44-1521, *et seq.*) ................................ 97

COUNT IX   BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER ARIZONA LAW (Ariz.
Rev. Stat. § 47-2314) ..................................................... 101

          3.    Nebraska ..................................................... 103

COUNT X   VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT (Neb. Rev. Stat. § 59-1601 *et seq.*) ............ 103

          4.    Missouri ..................................................... 107

COUNT XI   VIOLATION OF MISSOURI MERCHANDISING
PRACTICES ACT (Mo. Rev. Stat. § 407.010, *et seq.*) ................ 107

          5.    Wisconsin ................................................... 111

COUNT XII   VIOLATIONS OF THE WISCONSIN  DECEPTIVE
TRADE PRACTICES ACT (Wis. Stat. § 110.18) ....................... 111

COUNT XIII BREACH OF IMPLIED WARRANTY OF
              MERCHANTABILITY UNDER WISCONSIN LAW
              (Wis. Stat. § 402.314 and 411.212)............................................. 116

REQUEST FOR RELIEF ..................................................................... 117

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.      INTRODUCTION

1.      Ford Motor Company ("Ford") sold Ford Escapes, Ford Mavericks, and Lincoln Corsairs equipped with faulty engines that can suffer a "block breach," which is Ford's euphemistic language for the engine seizing and shattering the engine rods and connecting bearings, which can be propelled through the engine block itself or the oil pan. In layman's terms, this is a blown engine. The "block breach" or blown engine, however named, causes the engine to stall and it causes highly flammable fluid and vapors to escape, causing an under hood fire, or at least presenting a serious fire risk.

2.      Though Ford knew or should have known of the stall and fire risk prior to launching the vehicles, it did nothing to promptly warn owners and lessees, instead waiting over a year to announce a safety recall. Ford then assured its customers that it had developed a "fix" that would alleviate the risk of fire, but it chose not to inspect the engines to determine which cars had the defect or issue a *bona fide* fix that addressed the engine defect, and Ford completely ignored the dangerous engine stall condition that always results from a blown engine. Instead,

Ford chose to remove Active Grille Shutter Blinds and drill holes in the under-engine shield in an attempt to mitigate the risk that fluids and vapors expelled from the blown engines will ignite, while leaving the vapors and fluids themselves to run onto the roadways, or onto vehicle owners' driveways and garages.

3.      But this "fix" utterly failed, leaving all owners in the same position as owners like Plaintiffs Nishon and Capps who suffered catastrophic cars fires when the engines in their Stall/Fire Risk Vehicles blew up. Ford has admitted its recall did not work, but it has yet to announce a fix.



**Plaintiff Nishon's Car Fire**



**Plaintiff Capp's Car Fire**

4.      Ford has never addressed the dangerous stall risk and all of the

Stall/Fire Risk Vehicles remain at risk of a catastrophic block breach and engine

fire, including those vehicles that have had the recall repair. What is more, Ford's

now abandoned first "fix" creates new safety, environmental, and performance

issues for those who have had the recall performed that Ford has not addressed.

5.      Shockingly, Ford knows how to address this dangerous defect. In March 2022, Ford issued Safety Recall 22S10, which covered a subset of 155 of the MY2021 Ford Escapes with the 2.5L engine. The issue was an improper crankshaft machining surface, which led to the exact failure here, a "block breach" caused by the connecting rods and bearings being expelled through the block and oil pan.[1] For that recall, Ford instructed dealers to inspect the connecting rod bearings against a subjective instruction guide, and replace the engine if the defect is revealed.[2] Ford could easily implement that same recall inspection and repair here, and it would reveal exactly which of the now over 125,000 vehicles has the faulty engine. Ford is now refusing to actually inspect the engines of the recall population, presumably because it does not want to pay the approximately $470 per car inspection time that it authorized for its dealers in the 22S10 Recall,[3] which would cost Ford at least $59 million. Apparently to Ford, the safety of 125,000 of its customers is not worth $59 million.

---

[1] *See* **Exhibit 1**, Letter to All U.S. Ford and Lincoln Dealers regarding Advance Notice of Safety Recall 22S10 (Feb. 24, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V109-4423.pdf; **Exhibit 2**, Letter to All U.S. Ford and Lincoln Dealers regarding Supplement #1 to Advance Notice of Safety Recall 22S10 (May 17, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V109-4343.pdf.

[2] *See id.*

[3] *See id.* The recall allows for 4.7 hours of shop time to inspect the engine. At a conservative $100 per hour rate, this is $470 per car.

6.     Model Year 2020-2023 Ford Hybrid Escapes, 2022-2023 Ford Hybrid Mavericks, and 2021-2023 Lincoln Hybrid Corsairs (the "Stall/Fire Risk Vehicles") contain 2.5-liter hybrid electric vehicle ("HEV") and 2.5-liter plug-in hybrid electric vehicle ("PHEV") engines that can suffer a "block breach" and eject significant quantities of engine oil and/or fuel vapor that can accumulate near ignition sources, resulting in a spontaneous stall and under hood smoke and fires (the "Spontaneous Stall/Fire Risk").

7.     The Spontaneous Stall/Fire Risk exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle engine blows and suddenly stalls and ejects fluids and vapors or catches fire while in operation. The Spontaneous Stall/Fire Risk also exposes passengers, other drivers on the road, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

8.     This stall and fire risk was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Spontaneous Stall/Fire Risk to consumers both before and after their purchases of Stall/Fire Risk Vehicles, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Spontaneous Stall/Fire Risk—e.g., damage to a vehicle and injury or death to persons in the vehicle or

another vehicle in proximity should the Stall/Fire Risk Vehicle suddenly stall and lose power, or catch on fire, and/or damage to property from engine oil and fuel vapor leaking onto roadways and driveways, and into garages.

9.     Warranty claims relating to the Spontaneous Stall/Fire Risk were made to Ford as early as April 5, 2021.[4] Yet Ford continued to sell the Stall/Fire Risk Vehicles and did nothing to warn purchasers of the Spontaneous Stall/Fire Risk until it issued a stop-sale order on June 8, 2022.

10.    Prior to its original recall, Ford admitted that there had been at least 23 reports of under hood fires or smoke in a vehicle population of 100,689. The fires have all occurred in the engine compartment of the Stall/Fire Risk Vehicles.

11.    In July, 2022, Ford recalled the Stall/Fire Risk Vehicles and instituted a "fix," but the fix Ford used to resolve the Stall/Fire Risk did not include any inspection of the vehicle engines and did not address the manufacturing flaws in the 2.5L HEV/PHEV engines that could lead to the stall and explosive block breach and possible fire. Instead, Ford completely ignored the risk of a dangerous stall and pushed a fire "fix" that required dealers to drill drainage holes in the Stall/Fire Risk Vehicles' under-engine shields and to remove four blinds from the vehicles' Active Grille Shutter systems to allow ejected fluid and vapors from a

---

[4] **Exhibit 3**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22V-484 (July 7, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF, at 4.

block breach to escape from the Stall/Fire Risk Vehicles' engine compartments before igniting.[5] Choosing profits over safety, Ford chose not to inspect the engines to locate and replace those that were defectively manufactured.

12.     To enable its dealers across the country to perform this dubious "fix," Ford sent a detailed letter to the dealers explaining the modifications required on all Stall/Fire Risk Vehicles.[6]

13.     One-half of the "fix" requires dealers to remove the under-engine shield, drill a series of five holes measuring one-and-three-quarters of an inch in diameter, and cut out one slightly larger section from near the center of the shield.[7] These modifications are highlighted in the image below.

---

[5] A blind is a segment of the grille shutter system that opens and closes to change air flow through the engine compartment. *See, e.g.*, **Exhibit 4**, Letter to All U.S. Ford and Lincoln Dealers regarding New Vehicle Demonstration/Delivery Hold (July 8, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V484-1315.pdf.
[6] *See id.*
[7] *Id.* at 9-15.



*Figure 1:* **Image from Ford's letter to its dealers demonstrating the under engine shield modification, with additional drainage holes highlighted in blue, as part of the required "fix" on all Spontaneous Fire Vehicles.[8]**

14.    The other half of the "fix" requires dealers to remove four shutter blinds from the Active Grille Shutter system by bending the blinds at the center, pulling them toward the front of the vehicle, and removing the side tabs to dislodge the blinds.[9] The images below show an active shutter grille system before and after the four blinds are removed, as well as a closer view of the blinds removed from one Stall/Fire Risk Vehicle.

---

[8] *Id.* at 15.
[9] *Id.* at 7-9.





*Figure 2:* **Images from Ford's letter to its Dealers showing the Active Grille Shutter System before and after four blinds are removed as part of the "fix"**[10]

---

[10] *Id.* at 7, 9.



***Figure 3:*** **Image of four blinds removed from a Ford Maverick active grille shutter system as part of Ford's "fix" for the Stall/Fire Risk Vehicles[11]**

15.     The "fix" did not work. Ford continued to receive reports of block breach fires, even in Stall/Fire Risk Vehicles that had the recall repair correctly performed. Less than a year after the recall "fix" was announced, Ford issued a new recall to replace and expand it but offered no new or revised fix or repair.

---

[11] **Exhibit 5**, "u/Ford_Trans_Guy," *22S47 Underhood Fire Recall*, Reddit.com (July 27, 2022), https://www.reddit.com/r/FordMaverickTruck/comments/w9jadp/22s47_underhood_fire_recall.

16.     Aside from being an ineffective solution, Ford's "fix" created new problems. First, it simply did not do anything to address the potential for an explosive block breach from defective engine machining. Second, allowing ejected fluids and vapors to leak out of the Stall/Fire Risk Vehicles creates an environmental hazard and sets the stage for future property damage and possible injury. Furthermore, removing several of the blinds from the Active Grille Shutter: (1) increases aerodynamic drag on the vehicles, resulting in decreased fuel efficiency; (2) increases warm-up time in cold weather, which increases emissions; and (3) lengthens the time required to warm the passenger cabin and defrost the windshield. Drilling holes and cutting openings in the under-engine shield creates additional performance issues. The shield is designed to reduce aerodynamic drag and protect the engine and powertrain from road debris, snow packing, corrosive salt spray, and road splash. Perforating the shield will increase road noise and unquestionably allow increased environmental intrusion of the engine compartment.

17.     Critically, Ford would have completed all of its pre-sale testing, measurements, durability testing and certifications with the Active Grille Shutters and under-engine shield intact. None of it has been redone following these significant system degradations, meaning that Ford is selling these vehicles with

specifications and durability testing results that are at least suspect, if not outright inflated.

18.     In June 2023, nearly a year after it claimed to have resolved the Stall/Fire Risk, Ford initiated a new recall that "expands and replaces" its recall from July 2022.[12] Ford admits that "Vehicles previously repaired under 22V-484 will need to have the new remedy completed."[13] Yet there is no new remedy specified in the recall, only a promise to mail additional letters to consumers "once the remedy is available."[14]

19.     A vehicle that has a risk of spontaneously stalling and catching on fire while in operation is not fit for its ordinary purpose. And a "fix" that does nothing to inspect for and repair an underlying issue, and in fact creates additional problems, is not a fix at all. Ford is placing an unfair burden on class members whose vehicles are still powered by engines that may literally explode and eject flammable fluids and vapors, and whose vehicles now burn more fuel, require longer times to warm up and defrost the windshield, are noisier and less durable, and now may now additionally face the risk of flammable fluids and vapors

---

[12] *See* **Exhibit 6**, Letter from NHTSA to Ford acknowledging Ford's notification of Recall No. 23V-380 (June 5, 2023), https://static.nhtsa.gov/odi/rcl/2023/RCAK-23V380-9304.pdf.
[13] *Id.*
[14] *Id.*

leaking onto their garages or driveways—without the original fire risk being alleviated all.

20.    Ford knew or should have known about the Spontaneous Stall/Fire Risk before the Stall/Fire Risk Vehicles went to market. At the very least, Ford certainly knew about the Spontaneous Stall/Fire Risk well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Stall/Fire Risk Vehicles; (2) the direct and public reports of smoke or fires in 23 Stall/Fire Risk Vehicles; and (3) Ford's own investigation of fires in the Stall/Fire Risk Vehicles.

21.    Ford also knew that its July 2022 recall "fix" would be ineffective. It had already issued a recall for the same issue where it inspected the engines in the field and replaced those that had a machining defect that could lead to block-breach and fires. Ford chose not to implement that inspection and replacement fix because it cost too much, even though Ford knew that it was not addressing the underlying issue of catastrophic engine failure leading to an engine block breach. Even if Ford's estimate of a one-percent defect rate (in 125,322 Stall/Fire Risk Vehicles) is accurate[15]—and Ford has provided no evidence that it is not the 5% failure rate it disclosed in its first block breach defect recall—this still means that Ford sold at least 1,253—and may have sold over 6,250—ticking time bombs, the

---

[15] *See* **Exhibit 7**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 23V-380 (May 26, 2023), https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V380-2876.PDF, at 1.

vast majority of which are still on the road, at risk of stall and fire every time they are driven.

22.    Ford offers no reimbursement to Stall/Fire Risk Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because a *bona fide* repair to the 2.5L HEV/PHEV engines was not being made, putative class members are left with a vehicle that has had its functional Active Grill Shutter System partially destroyed and its engine shield perforated, and without a safely operable vehicle for an unknown and potentially lengthy period.

23.    To add further insult to injury, rather than do the right thing and globally offer every consumer a buy back of their Stall/Fire Risk Vehicle at a fair price—e.g., the Blue Book value on the day before the recall was announced—or at least offer to provide a comparable loaner, Ford has done nothing of the sort.

24.    Because of Ford's omissions regarding the Spontaneous Stall/Fire Risk and failure to act more quickly in disclosing and providing a true remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiffs and other owners and lessees of the Stall/Fire Risk Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and putative class members known of the Spontaneous Stall/Fire Risk, then they would either not have purchased or leased those vehicles or would have paid less for them.

Spontaneous stall, or fires and smoke in the Stall/Fire Risk Vehicles necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs. And Plaintiffs and class members whose vehicles have undergone Ford's "fix" remain at the very same risk of spontaneous fire, have cars with partially ruined components, and may now additionally need to contend with property damage due to leaked fluids and vapors.

25.   Plaintiffs bring this class action to redress Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II.   JURISDICTION

26.   This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Nationwide Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

27.   This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because

Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

### III.   VENUE

28.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.   PARTIES

**A.     Plaintiffs**

**1.     Todd Nishon (California)**

29.     Plaintiff and proposed class representative Todd Nishon ("Plaintiff" for purposes of this paragraph) is a resident and citizen of San Diego, California. Plaintiff purchased a 2021 Escape Titanium Hybrid on or about November 2, 2021, from Kearny Mesa Ford in San Diego, California. Plaintiff's Ford Escape is a Stall/Fire Risk Vehicle that suffers from the Spontaneous Stall/Fire Risk.

30.     Plaintiff purchased his Stall/Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly used it for his own transportation needs. He also used the vehicle to transport his family and to run errands.

31.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these

were the primary reasons Plaintiff purchased the Stall/Fire Risk Vehicle. However, despite touting the safety, reliability, and family-friendly aspect of the Stall/Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Stall/Fire Risk to Plaintiff before his purchase.

32.    Plaintiff received the recall and repair notice from Ford indicating that Ford had a repair that could be completed to alleviate the Stall/Fire Risk in his vehicle. In or about September 2022, Plaintiff had his vehicle at the dealership for an oil change and asked his dealer to complete the recall repair so that it would no longer be subject to the Spontaneous Stall/Fire Risk. The dealership declined to complete the recall repair. It told Plaintiff that it only had one employee trained to complete the recall and that employee could only do the work on particular weekdays. The dealership declined to schedule a day for Plaintiff to have the recall completed.

33.    On or about October 28, 2022, at approximately 8pm, the engine compartment in Plaintiff's Ford Escape hybrid exploded into flames. Plaintiff was fortunate to escape the inferno, as the pictures below show.





34.     Had Plaintiff been aware of the Spontaneous Stall/Fire Risk he would

not have purchased this vehicle, or he would have paid less for the vehicle.

## 2.    James Capps (Arizona)

35.    Plaintiff and proposed class representative James Capps ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Kingman, Arizona. Plaintiff purchased a 2021 Ford Escape Hybrid on or about February 24, 2021, from Anderson Ford in Kingman, Arizona. Plaintiff's Escape Hybrid is a Stall/Fire Risk Vehicle that suffers from the Spontaneous Stall/Fire Risk.

36.    Plaintiff purchased his Stall/Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly used it for his own transportation needs and for running errands. Plaintiff's wife also regularly rode in the vehicle with him.

37.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff also states that he assumed Ford had conducted proper safety testing before marketing the vehicle. However, despite touting the safety and reliability of the Stall/Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Stall/Fire Risk to Plaintiff before his purchase.

38.    On April 5, 2022, Plaintiff and his wife were driving to Mesquite, Nevada, from Kingman, Arizona. They were about 40 miles north of Kingman, around 12:30 pm, at the intersection of Stockton Hill road, and Pierce Ferry road when plaintiff notice the vehicle was not driving right. Plaintiff turned the vehicle

around to go back to Kingman. Plaintiff noticed white smoke coming from under

the car and immediately turned around to pull off at the intersection, which was

about 50 yards away. The car gave the message "zero oil pressure" "engine shut

down." The vehicle rolled into the pull-off and Plaintiff shut it down. Another

vehicle pulled in and yelled at Plaintiff and his wife to get out of the vehicle as it

was on fire. Plaintiff and his wife grabbed what was handy and got out

immediately. The vehicle was totally consumed by the fire within about 15

minutes. Below is a photograph of the Stall/Fire Risk Vehicle engulfed in flames.



39.     A few days after the fire, Plaintiff received a recall notice about

catastrophic engine failure and fire. Had Plaintiff been aware of the Spontaneous

Stall/Fire Risk and Ford's proposed "fix," he would not have purchased the vehicle, or he would have paid less for the vehicle.

### 3.    Joseph Vaillancourt (Arizona)

40.    Plaintiff and proposed class representative Joseph Vaillancourt ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Phoenix, Arizona. Plaintiff purchased a 2021 Escape Hybrid on or about November 26, 2021, from a dealership in Glendale, Arizona. Plaintiff's Escape is a Stall/Fire Risk Vehicle that suffers from the Spontaneous Stall/Fire Risk.

41.    Plaintiff purchased his Stall/Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs and for running errands. Plaintiff's daughter and son in law often ride with him, as do fellow church members.

42.    Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff also states that he assumed Ford had conducted proper safety testing before marketing the vehicle. However, despite touting the safety and reliability of the Stall/Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Stall/Fire Risk to Plaintiff before his purchase.

43.     Although Plaintiff's vehicle has been "fixed" in accordance with Ford's July 2022 Recall, Plaintiff now knows that this "fix," by design, did nothing to alleviate the stall risk, and Now is confirmed that it does not alleviate the fire risk either. Plaintiff is still concerned about driving the Stall/Fire Risk Vehicle. The additional holes drilled into his vehicle's under-engine shield and the blinds removed from his vehicle's active grille shutter are not an adequate "fix" because these changes do not address the underlying manufacturing problems with the engine. If a manufacturing issue renders the engine of Plaintiff's vehicle susceptible to leaking fluid and vapors, then Ford's fix should remedy that issue, and it should not just attempt to provide an escape route for those fluids and vapors to end up on the road, on Plaintiff's driveway, or on the floor of Plaintiff's garage.

44.     Had Plaintiff been aware of the Spontaneous Stall/Fire Risk and Ford's proposed "fix," he would not have purchased the vehicle, or he would have paid less for the vehicle.

### 4.    Harry Hilburg (Missouri)

45.     Plaintiff and proposed class representative Harry Hilburg ("Plaintiff for the purposes of this paragraph) is a resident and citizen of St. Louis, Missouri. Plaintiff purchased a 2022 Escape Hybrid on or about May 25, 2022, from a dealership in Ellisville, Missouri. Plaintiff's Escape is a Stall/Fire Risk Vehicle that suffers from the Spontaneous Stall/Fire Risk.

46.     Plaintiff purchased his Stall/Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs and for running errands. Plaintiff's wife also regularly rides in the vehicle with him.

47.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff also states that he assumed Ford had conducted proper safety testing before marketing the vehicle. However, despite touting the safety and reliability of the Stall/Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Stall/Fire Risk to Plaintiff before his purchase.

48.     On or about September 12, 2022, Plaintiff delivered his vehicle to his dealer to have Ford's 22S4704 recall repair performed. Although at that time, the dealer and Ford's recall documentation indicated to Plaintiff that his vehicle had been "fixed" in accordance with Ford's recall, Plaintiff was still concerned about driving the Stall/Fire Risk Vehicle. Plaintiff did not believe that the additional holes drilled into his vehicle's under-engine shield or the blinds removed from his vehicle's Active Grille Shutter were an adequate "fix" because these changes did not address the underlying manufacturing problems with the engine.

49.     In June 2023, Plaintiff received a new recall notice from Ford that appeared to warn Plaintiff of the exact same engine failure and fire risk that had

supposedly been fixed with the prior recall. Plaintiff was dismayed to learn that the prior recall "repair" had actually done nothing to reduce the Spontaneous Stall/Fire Risk and that he had been driving his car with this ongoing defect the entire time. Ford's new recall provided no information about an actual repair and only promised a future notice when it was available.

50.     Had Plaintiff been aware of the Spontaneous Stall/Fire Risk, he would not have purchased the vehicle, or he would have paid less for the vehicle.

**5.     Raymond Dyne III (Nebraska)**

51.     Plaintiff and proposed class representative Raymond Dyne III ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Omaha, Nebraska. Plaintiff purchased a 2022 Ford Maverick on or about April 13, 2022, from a dealership in Omaha, Nebraska. Plaintiff's Maverick is a Stall/Fire Risk Vehicle that suffers from the Spontaneous Stall/Fire Risk.

52.     Plaintiff purchased his Stall/Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs and for running errands. Plaintiff is a single parent and his two children often ride in the Maverick.

53.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff also states that he assumed Ford had conducted proper safety testing before marketing the vehicle. However, despite touting the safety and reliability of

the Stall/Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Stall/Fire Risk to Plaintiff before his purchase.

54.     When Plaintiff first received notice concerning the recall and the "fix" was available, he attempted to schedule the work with the dealer. The dealer repeatedly told Plaintiff that it did not have the parts necessary to perform the recall fix. Several months later, Plaintiff read about the repair and noted that it did not require any new parts. Plaintiff contacted an 800 number on the recall notice and Ford then contacted the dealer and acted as a liaison to set up an appointment for Plaintiff to have the recall "fix" done.

55.     On March 16-17, 2023, Plaintiff's Maverick was at the dealer for the "fix." Plaintiff was not offered nor provided a loaner vehicle. Instead, Plaintiff had to take an Uber from the dealership for drop-off and to the dealership to pick up his Maverick after the work was done. Plaintiff is very concerned that even though his vehicle has been "fixed" in accordance with Ford's recall, it remains at risk of a spontaneous stall and fire while driving. Plaintiff regularly drives with his two children and he is unsure if he could safely get them out of the car in the event of a spontaneous fire and he is very concerned that a spontaneous stall could result in a serious accident. For these reasons, Plaintiff goes out of his way to avoid longer trips in his Maverick, especially with his children. Plaintiff is also concerned that

the perforation of the under-engine shield and removal of the Grille Shutter Blinds has made his Maverick less fuel efficient and adversely affected its durability.

56.     Plaintiff believes that Ford should have inspected his engine to determine whether it has a manufacturing defect that could cause his engine to blow, causing a spontaneous stall and fire. Plaintiff believes that Ford has diminished the value of his Maverick by manufacturing it with an engine defect and by unnecessarily removing the Active Grille Shutters and drilling holes in his engine shield, for no benefit at all.

57.     Had Plaintiff been aware of the Spontaneous Stall/Fire Risk, he would not have purchased the vehicle, or he would have paid less for the vehicle.

**6.     William Simmons (Wisconsin)**

58.     Plaintiff and proposed class representative William Simmons ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Janesville, Wisconsin. Plaintiff purchased a 2022 Lincoln Corsair on or about September 9, 2022, from a dealership in Janesville, Wisconsin. Plaintiff's Corsair is a Stall/Fire Risk Vehicle that suffers from the Spontaneous Stall/Fire Risk.

59.     Plaintiff purchased his Stall/Fire Risk Vehicle as his primary, day-to-day vehicle. He regularly uses it for his own transportation needs and for running errands. Plaintiff's wife also regularly rides in the vehicle with him.

60.     Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of reliability and safety. Plaintiff also states that he assumed Ford had conducted proper safety testing before marketing the vehicle. However, despite touting the safety and reliability of the Stall/Fire Risk Vehicle, at no point did Ford or its agents or other representatives disclose the Spontaneous Stall/Fire Risk to Plaintiff before his purchase.

61.     Plaintiff received a recall notice in or about June 2023, concerning the risk of engine failure and under hood fire. Plaintiff contacted his dealer to inquire about the recall and was repeatedly told that it was not available. Later, the dealership told Plaintiff that the recall repair was no longer available and Ford was working on a new repair that was not yet available.

62.     Had Plaintiff been aware of the Spontaneous Stall/Fire Risk, he would not have purchased the vehicle, or he would have paid less for the vehicle.

## V.     FACTUAL ALLEGATIONS

**A.     Ford Marketed The Stall/Fire Risk Vehicles as Safe, Reliable, And Fuel-Efficient, And Ford Knew That These Attributes Were Material To Consumers**

63.     The Ford and Lincoln Stall/Fire Risk Vehicles are marketed to consumers as safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact

material to Plaintiffs and Ford had the opportunity when describing safety features in sales material to be truthful.

64.     For example, in the sales brochure for the 2020 Ford Escape, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Stall/Fire Risk Vehicles because Ford knew safety was material to the average customer.[16] Plaintiffs do not allege that the statements in the following brochures are false, rather they demonstrate that Ford knew safety was material and Ford had an opportunity to make complete safety related disclosures in this brochure and in the others cited below.

---

[16] *See* **Exhibit 8**, Model Year 2020 Ford Escape brochure, at 11; **Exhibit 9**, Model Year 2021 Ford Escape brochure, at 9, 14.

## MAKE YOUR WAY.
# CONFIDENTLY.

Changing lanes. Keeping your distance. Parallel and perpendicular parking. Our extensive well-rounded collection of standard and available Ford Co-Pilot360™ Technology features can help you with these everyday situations and so many more. Our advanced technologies are about supplementing your driving skills.¹ Helping you feel confidently in command on the road.

## FORD CO-PILOT360™ TECHNOLOGY

### FORD CO-PILOT360

*Standard on every 2022 Ford Escape® SUV*
- Pre-Collision Assist with Automatic Emergency Braking (AEB)
- BLIS® (Blind Spot Information System) with Cross-Traffic Alert
- Lane-Keeping System
- Auto High-Beam Headlamps
- Rear View Camera
- Autolamp (Automatic On/Off Headlamps)
- Post-Collision Braking

### FORD CO-PILOT360 ASSIST+

*Standard on Titanium;*
*Available on SE and SEL*
- Intelligent Adaptive Cruise Control with Stop-and-Go and Lane Centering includes Speed Sign Recognition
- Evasive Steering Assist
- Voice-Activated Touchscreen Navigation System



**SCAN TO LEARN MORE**
or visit
Ford.com/Technology
*Data rates may apply.*



65.     In the sales brochure for the 2022 Ford Maverick, Ford again focused on safety features. Knowing safety is material to Plaintiffs and putative class members, Ford told consumers that the Maverick's built-in Ford Co-Pilot 360 Technology can help drivers "feel confidently in command behind the wheel."[17]

---

[17] **Exhibit 10**, Model Year 2022 Ford Maverick brochure, at 7.





66.     In the brochure given to dealership personnel to inform consumers about the vehicle, Ford noted among the available safety features the inclusion of a LATCH system (lower anchors and tether anchors for children), which is specifically designed to safely secure children's car seats in the car, because Ford knew the safety of customers' children was material to the average consumer.[18]

---

[18] **Exhibit 10**, Model Year 2022 Ford Maverick dealership brochure, at 11.

67.     Ford also emphasizes the Maverick's overall reliability, noting that the truck is "engineered for extremes" and has undergone "durability testing" because Ford knew that reliability is material to the average consumer.[19]

**ENGINEERED FOR EXTREMES**
The Maverick™ pickup architecture has endured 19 million miles of customer equivalent durability testing in real world, lab and proving ground environments. It's been tested in extreme weather, taken over off-road durability tests, endured harsh chassis tuning, and much more. After these tests, it's more than ready for yours.

68.     Importantly, Ford has not redone any of this durability testing on vehicles that have had their Active Grille Shutters removed and their under-engine shields perforated. These changes will certainly allow more road debris, water, salt and snow into the engine compartment which would likely decrease durability and could have many other adverse consequences. Yet Ford does not know the extent of these adverse effects because it has made no attempt to discover them, instead sticking with its testing from before the engine compartment was compromised by its failed recall "fix."

69.     Ford makes similar claims about safety and reliability in its sales brochures for the 2021-2022 Lincoln Corsairs. As with the Ford Maverick, the

---

[19] *Id.* at 10.

Lincoln Corsair safety features list includes a LATCH system,[20] appealing to consumers with young children whose car seats need to be safely secured in the vehicle, because Ford knew the safety of customers' children was material to the average consumer.

70.     Both the 2021 and 2022 sales brochures for the Ford Maverick highlight a host of other safety features, including blind spot detection, a lane-keeping system, pre-collision assist, and a rearview camera, because Ford knew safety was material to the average customer.[21] The 2022 brochure further boasts that drivers will experience "all-season confidence."[22]

---

[20] **Exhibit 11**, Model Year 2021 Lincoln Corsair brochure, at 9; **Exhibit 12**, Model Year 2022 Lincoln Corsair brochure, at 13.
[21] **Exhibit 11**, Model Year 2021 Lincoln Corsair brochure, at 4; **Exhibit 12**, Model Year 2022 Lincoln Corsair brochure, at 11.
[22] **Exhibit 12**, Model Year 2022 Lincoln Corsair brochure, at 8.



71.     As with the Escape and the Maverick, Ford also highlights the

Corsair's engine's performance and reliability. The 2022 brochure notes that even

the base model "smoothly responds" and offers a "thrilling drive,"[23] leading

consumers to believe that the engine is of high quality and reliable.



---

[23] *Id.* at 8.

**B.     Ford Marketed The Stall/Fire Risk Vehicles As Fuel-Efficient And Ford Knew This Attribute Was**

72.     The Ford and Lincoln Stall/Fire Risk Vehicles are marketed to consumers as fuel-efficient and Ford knew this quality was material to consumers in marketing the vehicles in this manner. This quality was in fact material to Plaintiffs.

73.     For example, in the sales brochure for the 2020 Ford Escape, Ford noted that customers could expect to achieve an average of 40 miles per gallon in the vehicle.[24]

---

[24] **Exhibit 8**, Model Year 2020 Ford Escape brochure, at 2.



74.     Ford similarly advertised the fuel economy of the 2021-2022 Model Year Ford Escapes (up to 41 combined miles-per-gallon),[25] and it emphasized the 2021-2022 Model Year Lincoln Corsairs' hybrid capabilities.[26]

75.     In advertising the 2022 Model Year Ford Maverick, Ford noted that customers could expect to achieve an average of 37 miles per gallon.[27] Ford also

---

[25] **Exhibit 9**, 2021 Model Year Ford Escape brochure, at 16; **Exhibit 13**, 2022 Model Year Ford Escape brochure, at 16.
[26] **Exhibit 11**, 2021 Model Year Lincoln Corsair brochure, at 9; **Exhibit 12**, 2022 Model Year Lincoln Corsair brochure, at 7.
[27] **Exhibit 10**, 2022 Model Year Ford Maverick brochure, at 2.

referred to the vehicle as having "excellent affordability" thanks to its high fuel

efficiency.[28]



76.     Furthermore, Ford specifically advertised that its 2020-2022 Model

Year Ford Escapes and 2021-2022 Model Year Lincoln Corsairs were equipped

with active grille shutters.[29] Ford explains on its website that active grille shutters

reduce aerodynamic drag on its vehicles and improve fuel efficiency.[30]

---

[28] *Id.*

[29] **Exhibit 8**, Model Year 2020 Ford Escape brochure, at 3; **Exhibit 9**, Model Year 2021 Ford Escape brochure, at 14; **Exhibit 13**, Model Year 2022 Ford Escape brochure, at 15; **Exhibit 11**, Model Year 2021 Lincoln Corsair brochure, at 9; **Exhibit 12**, Model Year 2022 Lincoln Corsair brochure, at 13.

[30] **Exhibit 14**, *Active Grille Shutter*, Ford, https://www.ford.com.au/technology/active-grill-shutter (last accessed Oct. 7, 2022).

77.     As Ford notes, "[a]erodynamic 'drag' is reduced when the grille is closed or partially closed, as air cannot flow through the grille into the vehicle."[31]

78.     Active Grille Shutters are highly engineered systems useful to reduce aerodynamic drag and increase fuel efficiency. Recent Society of Automotive Engineers technical papers published in 2022 found that Active Grille Shutters can improve vehicle fuel economy between 1-4%.[32,33]

79.     While Active Grille Shutters primarily reduce aerodynamic drag, these systems have important secondary benefits, including improving the warm up time of the engine when parked and retaining engine heat when parked.[34,35] Reducing warm up time reduces harmful engine emissions, in addition to aiding passenger comfort in cold weather and safety in reducing time to defrost a windshield. Minimum windshield defroster performance is regulated by a Federal

---

[31] *Id.*

[32] **Exhibit 15**, Chacko, S., Alonso, C., Solimene, A., Simon, J. et al., "Fuel Economy Benefit of Active Grille Shutters for Real World, Worldwide Harmonized Light Vehicles Test Procedure, and Real Driving Emission Cycles," SAE Technical Paper 2022-01-5013, 2022, doi:10.4271/2022-01-5013.

[33] **Exhibit 16**, Cho, Y., Chang, C., Shestopalov, A., and Tate, E., "Optimization of Active Grille Shutters Operation for Improved Fuel Economy," SAE Int. J. Passeng. Cars - Mech. Syst. 10(2):2017, doi:10.4271/2017-01-1513.

[34] **Exhibit 17**, Dutta, N., Spenley, M., Cromback-Dugeny, P., Stegmann, B. et al., "Active Grille Shutters Control and Benefits in Medium to Large SUV: A System Engineering Approach," SAE Technical Paper 2020-01-0945, 2020, doi:10.4271/2020-01-0945.

[35] **Exhibit 18**, El-Sharkawy, A., Kamrad, J., Lounsberry, T., Baker, G. et al., "Evaluation of Impact of Active Grille Shutter on Vehicle Thermal Management," *SAE Int. J. Mater. Manuf.* 4(1):1244-1254, 2011, doi:10.4271/2011-01-1172.

Motor Vehicle Safety Standard, FMVSS Standard No. 103.[36,37] On information and belief, Ford has not rerun FMVSS No. 103 testing, so it has not established whether it remains compliant with this required standard following the recall modifications that it implemented both in consumer vehicles and during manufacturing. Failure to meet FMVSS standards can require an automatic recall.

## C.   Plaintiffs And Class Members Paid Thousands Of Dollars For The Stall/Fire Risk Vehicles Because They Thought The Vehicles Were Safe, Reliable, And Fuel-Efficient

80.   Plaintiffs and putative class members, believing in the safety, reliability, and fuel efficiency of the Stall/Fire Risk Vehicles as touted by Ford, paid thousands of dollars for the vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2023 Ford Escape Plug-In Hybrid is $41,995.[38] The MSRP for the Escape Hybrid starts at $34,835 for the ST-Line trim and goes up to $40,955 for the ST-Line Elite;[39] the MSRP for the 2022 Ford Maverick starts at $22,595 for the base-level trim and goes up to $28,355;[40] and the MSRP for the

---

[36] 49 CFR § 571.103.

[37] **Exhibit 19**, NHTSA Laboratory Test Procedure for FMVSS 103 (June 26, 1996), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/tp-103-13_tag.pdf.

[38] **Exhibit 20**, 2023 Ford Escape Plug-in Hybrid, Edmunds.com, https://www.edmunds.com/ford/escape/2023/plug-in-hybrid/.

[39] **Exhibit 21**, 2023 Ford Escape Hybrid, Edmunds.com, https://www.edmunds.com/ford/escape/2023/hybrid/.

[40] **Exhibit 22**, 2023 Ford Maverick, Edmunds.com, https://www.edmunds.com/ford/maverick.

2023 Lincoln Corsair starts at $39,885 for the base-level trim and goes up to $54,580.[41]

81.     Plaintiffs and putative class members would not have paid these prices for Stall/Fire Risk Vehicles if they had known that the vehicles were not, in fact, safe and reliable, that Ford's purported "fix" would damage designed-in features to prolong durability and safety and would result in reduced fuel efficiency, and would be installed in the vehicle without the standard FEMV analysis performed on all vehicle systems pre-sale.

### D.     Ford's Vehicle Warranties

82.     Ford's New Vehicle Limited Warranty for Model Years 2020-2023 of the Ford Escape provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[42] Ford's Powertrain Warranty for the Escape provides coverage for 5 years/60,000 miles, whichever comes first.[43] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Stall/Fire Risk in the Stall/Fire Risk Vehicles.

---

[41] **Exhibit 23**, 2023 Lincoln Corsair, Edmunds.com, https://www.edmunds.com/lincoln/corsair.

[42] **Exhibit 8**, Model Year 2020 Ford Escape brochure, at 16; **Exhibit 9**, Model Year 2021 Ford Escape brochure, at 16; **Exhibit 13**, Model Year 2022 Ford Escape brochure, at 16.

[43] **Exhibit 8**, Model Year 2020 Ford Escape brochure, at 16; **Exhibit 9**, Model Year 2021 Ford Escape brochure, at 16; **Exhibit 13**, Model Year 2022 Ford Escape brochure, at 16.

83.     Ford's New Vehicle Limited Warranty for the Model Year 2022-2023 Ford Maverick provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[44] Ford's Powertrain Warranty for the Maverick provides coverage for 5 years/60,000 miles, whichever comes first.[45] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Stall/Fire Risk in the Stall/Fire Risk Vehicles.

84.     Ford's New Vehicle Limited Warranty for Model Years 2021-2023 of the Lincoln Corsair provides "bumper-to-bumper" coverage for 4 years/50,000 miles, whichever comes first.[46] Ford's Powertrain Warranty for the Escape provides coverage for 6 years/70,000 miles, whichever comes first.[47] On information and belief, this warranty coverage includes manufacturing issues like the Spontaneous Stall/Fire Risk in the Stall/Fire Risk Vehicles.

85.     Because the Stall/Fire Risk Vehicles are all Model Year 2020, 2021, 2022, or 2023 vehicles sold or leased to putative class members in the fall of 2019 or later,[48] virtually all Stall/Fire Risk Vehicles—if not all of them, including

---

[44] **Exhibit 10**, Model Year 2022 Ford Maverick brochure, at 16.

[45] *Id.*

[46] **Exhibit 11**, Model Year 2021 Lincoln Corsair brochure, at 11; **Exhibit 12**, Model Year 2022 Lincoln Corsair brochure, at 14.

[47] **Exhibit 11**, Model Year 2021 Lincoln Corsair brochure, at 11; **Exhibit 12**, Model Year 2022 Lincoln Corsair brochure, at 14.

[48] **Exhibit 24**, Joey Capparella, *The 2020 Ford Escape Looks to Fill a Car-Shaped Hole in the Lineup*, CAR & DRIVER (April 2, 2019), https://www.caranddriver.com/news/a26996233/2020-ford-escape-photos-info;

Plaintiffs' vehicles—are still covered under Ford's new vehicle and powertrain warranties.

## E. The Spontaneous Stall/Fire Risk

86.    The Stall/Fire Risk Vehicles have had, and have now, a dangerous flaw in their engines that can cause internal components of the engine to literally explode and pierce the outer skin of the engine assembly. The explosion causes the engine to immediately stall and lose all power, and it causes flammable vapors and fluids to be ejected from the engine, which can result in an engine fire. In a prior recall of a subset of the Stall/Fire Risk Vehicles (Recall No. 22S10) for the same engine manufacturing defect and risk, Ford estimated that 5% of the vehicle population were affected. Without explanation, in the 22S47 recall Ford dropped that level to 1%, but even if Ford's estimate that this flaw affects just one percent of the Stall/Fire Risk Vehicles is accurate (and Ford has offered no evidence to suggest the number should not be 5% as it previously estimated), this means that there are at least 1,250 Stall/Fire Risk Vehicles on the road with engines that will explode, causing an immediate stall and loss of power, and ejecting flammable gas and liquids through a block breach into the engine compartment.

---

**Exhibit 25**, *2022 Ford Maverick: Release Date & Key Features*, BLUE SPRINGS FORD, https://www.bluespringsford.com/research/maverick.htm; **Exhibit 26**, Brett Foote, *2021 Lincoln Corsair Grand Touring PHEV Production Dates Revealed*, FORD AUTHORITY, Dec. 29, 2020, https://fordauthority.com/2020/12/2021-lincoln-corsair-grand-touring-phev-production-dates-revealed.

1.      **The March 2022 Recall**

87.      Ford admitted in a safety recall notification to the National Highway Traffic Safety Administration ("NHTSA"), NHTSA No. 22V-109, Manufacturer Recall No. 22S10 (the "March 2022 Recall"), that crankshaft machining surface finish issues in the engines of certain Ford Escape vehicles could cause engine block breach.[49]

88.      In that recall, Ford told customers:[50]

> On your vehicle, the crankshaft, located in the engine, may have an improperly polished bearing surface. Improper surface finish can cause excessive friction and heat, resulting in premature bearing wear and engine knocking noise. If the vehicle is driven in this condition, it will lead to bearing failure or a broken connecting rod that may result in an engine stall, significant engine oil loss, and fire, increasing the risk of crash and injury. If the engine on your vehicle is making noise, please take it to the dealer for diagnosis.

---

[49] **Exhibit 27**, NHTSA Part 573 Safety Recall Report No. 22V-109 (Feb. 24, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V109-8795.PDF. *See also* **Exhibit 1,** Letter to All U.S. Ford and Lincoln Dealers regarding Advance Notice of Safety Recall 22S10 (Feb. 24, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V109-4423.pdf; **Exhibit 2,** Letter to All U.S. Ford and Lincoln Dealers regarding Supplement #1 to Advance Notice of Safety Recall 22S10 (May 17, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V109-4343.pdf; **Exhibit 28**, Safety Recall Notice 22S10, NHTSA Recall 22V109 (Mar. 2022), https://static.nhtsa.gov/odi/rcl/2022/RCONL-22V109-7152.pdf.

[50] **Exhibit 28**, Safety Recall Notice 22S10, NHTSA Recall 22V109 (Mar. 2022), https://static.nhtsa.gov/odi/rcl/2022/RCONL-22V109-7152.pdf.

89.    Ford further explained in Safety Recall Notice 22S10 that:[51]

> Vehicles included in this action were built with an engine
> crankshaft that may not meet the surface specification
> due to a missing polishing operation. Improper surface
> finish can cause excessive friction and heat, resulting in
> premature bearing wear and engine noise. If the vehicle
> is driven in this condition, it will lead to bearing failure
> that may result in an engine stall, or broken connecting
> rod and potential engine breach, significant engine oil
> loss, and fire, increasing the risk of crash and injury.
> Plant records indicate that the suspect engine crankshafts
> have a surface finish that is potentially out of
> specification due to an emery lapping tape breakage that
> resulted in incomplete connecting rod journal #4
> polishing. The customer will experience engine noise.

90.    In this initial recall, Ford estimated that 5% of the engines had the

defect.[52]

91.    To address the issue of faulty manufacturing causing the potential for

blown engines causing spontaneous engine stalls and fires, Ford initiated an

inspection and replace protocol. Ford instructed dealers to remove the engine oil

pan, remove the #4 connecting rod cap, and inspect those connecting rod bearings

against a subjective instruction guide (Figure 4 and Figure 5).[53]

---

[51] **Exhibit 27**, NHTSA Part 573 Safety Recall Report No. 22V-109 (February
24, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V109-8795.PDF

[52] *See* **Exhibit 27**, NHTSA Part 573 Safety Recall Report No. 22V-109
(February 24, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V109-
8795.PDF.

[53] *See* **Exhibit 2,** Letter to All U.S. Ford and Lincoln Dealers regarding
Supplement #1 to Advance Notice of Safety Recall 22S10 (May 17, 2022),
https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V109-4343.pdf.



***Figure 4*.** **Connecting rod bearing evaluation guide from recall 22s10**



***Figure 5*.** **Connecting rod bearing evaluation guide from recall 22s10**

92.     If the bearings passed subjective inspection, the dealer would

reassemble the engine and return the vehicle to the customer. If the bearings failed

- 46 -

inspection, then the engine was replaced with a new long block assembly. This recall inspection procedure allowed 4.7 hours of labor charge plus parts for inspecting an engine that resulted in a "pass." With $100/hour labor charges, this would be over $500 per vehicle inspection, including parts. "Failed" vehicles cost significantly more to repair.[54] This recall remedy addressed the root cause of defective crankshaft journal surface finish damaging the connecting rod bearings. That is, the recall would find defective engines and replace them rather than let them fail and attempt to only mitigate one type of secondary failure (i.e., block breach leading to a fire).

### 2.     The July 2022 Recall

93.     Ford admitted in a July 7, 2022 safety recall notification to NHTSA, No. 22V-484 (the "July 2022 Recall"), that engine manufacturing issues resulting engine block or oil pan breaches, combined with fluid dynamics induced by Ford's under engine shield and active grille shutter, have caused certain Stall/Fire Risk Vehicles to catch on fire.[55]

---

[54] *See id.*

[55] **Exhibit 3,** National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 22V-484 (July 7, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V484-6430.PDF, at 3-4.

94.     In the July 2022 Recall, Ford further admits that the issues in the Stall/Fire Risk Vehicles can lead to "under hood fire, localized melting of components, or smoke."[56]

95.     The July 2022 Recall affected 100,689 total vehicles, including all Model Year 2020-2022 Ford Escapes built between January 19, 2019, and June 13, 2022; all Model Year 2022 Ford Mavericks built between February 3, 2021, and June 8, 2022; and all Model Year 2021-2022 Lincoln Corsairs built between October 24, 2019, and June 13, 2022.[57] This population included all of the cars that were subject to the March 2022 Recall, yet Ford made no mention of that recall or drew any connection between the identical failure modes in both recalls. Moreover, while in the March 2022 Recall Ford disclosed the dangerous stall risk that is obviously present when an engine catastrophically fails and ejects components through the block and oil pan, Ford made no mention of this risk in the July 2022 Recall, though it was obviously still present.

96.     As of June 22, 2022, Ford reported 23 warranty and field reports globally of under hood fire or smoke on 2.5L HEV/PHEV engines after a

---

[56] *See id.* at 3.
[57] *See id.* at 1-2.

suspected block or oil pan breach.[58] The date range of identified reports is April 5, 2021, through May 19, 2022.[59]

97.    Included in the 573 Report is Ford's "Description of the Cause: Isolated engine manufacturing issues have resulted in 2.5L HEV/PHEV engine failures involving engine block or oil pan breach. The fluid dynamics induced by the Under Engine Shield and Active Grille Shutter system could increase the likelihood of engine oil and/or fuel vapor expelled during an engine block or oil pan breach accumulating near sources of ignition, primarily expected to be the exhaust system."[60]

98.    Thus, Ford admits that the Stall/Fire Risk Vehicles suffer from engine manufacturing issues that can cause engine failures involving engine block or oil pan breach. Ford has chosen its language to attempt to minimize the seriousness of the issue. On information and belief, what is happening is that internal engine components called connecting rods and bearings are coming apart and piercing the metal shells of the engine block or oil pan, causing flammable vapors and liquids to be ejected into the engine compartment. In layman's terms, this is often referred to as a blown engine. Importantly, this is exactly what was happening to the engines subject to the March 2022 Recall, where Ford had its dealers visually

---

[58] *See id.* at 4.
[59] *See id.*
[60] *See id.* at 3.

inspect the engines for evidence of imminent failure, and replace them when warranted.

99.     Ford instituted a "fix" in connection with the July 2022 recall, but that "fix" was wholly silent as to the admittedly affected engine component. Ford left the engines exactly as they are and were, and instead recalled the Stall/Fire Risk Vehicles to drill holes into the under-engine shield and remove blinds from the Active Grille Shutter to supposedly prevent oil and gas and vapors from pooling in the engine compartment. This "fix" does not live up to its name because the engines in the Stall/Fire Risk Vehicles were never even looked at for evidence of the root cause of the failure, they were just as likely to blow up and eject parts and flammable fluids and vapors after the "fix" as they were before.

100.    Why Ford became suddenly silent on the dangerous stall risk and chose to institute a "fix" in the July 2022 Recall that never even caused the suspect engines to be inspected for a defect can be answered only through discovery in this case. But the huge difference in costs per vehicle between the legitimate recall and repair of the March 2022 Recall and failed and dubious "fix" of the July 2022 Recall is hard to ignore. The inspect and replace protocol from the March 2022 Recall involved 4.7 hours of labor and parts, likely costing over $500 per vehicle.[61]

---

[61] *See* **Exhibit 2,** Letter to All U.S. Ford and Lincoln Dealers regarding Supplement #1 to Advance Notice of Safety Recall 22S10 (May 17, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V109-4343.pdf.

In contrast, the dubious "fix" of the July 2023 Recall involved just 0.4 hours of labor for the Ford Maverick ($40 per car), 1 hour for the Escape ($100 per car), and 1.7 hours for the Corsair ($170 per car).[62] If Ford were to implement its inspect and replace protocol on the complete 125,000 car recall population, the cost to Ford would be over $60 million. In contrast, the dubious "fix" it implemented that makes no attempt to address the actual defect and instead sought only to avoid a potential fire after an engine blew up would have only cost Ford about $10.6 million.[63] Ford seems content to let its customers experience blown engines in order to save $50 million in costs to actually inspect, locate, and replace the engines before they fail.

### 3.    The June 2023 Recall

101.   On June 5, 2023, Ford notified NHTSA of Recall No. 23V-380, which "expands and replaces recall number 22V-484 (the "2023 Expanded Recall"). Vehicles previously repaired under 22V-484 will need to have the new remedy completed."[64] While the July 2022 recall, by design, did nothing to prevent a

---

[62] *See* **Exhibit 29**, Supplement 2 to Letter to All U.S. Ford and Lincoln Dealers regarding New Vehicle Demonstration/Delivery Hold, Safety Recall 22S47 (Aug. 10, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCMN-22V484-8637.pdf.

[63] Ford provided the number of each of the three affected models included in the recall. Multiplying that number by the respective repair costs per model yields just over $10.6 million total.

[64] *See* **Exhibit 6**, Letter from NHTSA to Ford acknowledging Ford's notification of Recall No. 23V-380 (June 5, 2023), https://static.nhtsa.gov/odi/rcl/2023/RCAK-23V380-9304.pdf.

blown engine, Ford now admits that the July 2022 Recall was also entirely ineffective and did nothing to prevent the risk of fire in the Stall/Fire Risk Vehicles that was caused by the blown engine.

102.   In the 2023 Expanded Recall, the 2022 Recall was expanded to include 2023 model years of all three Stall/Fire Risk Vehicles, thus including 125,322 Model Year "2020-2023 Escape, 2022-23 Maverick, and 2021-2023 Corsair vehicles equipped with 2.5L HEV or PHEV engines."[65]

103.   As to a remedy, Ford offers none. "Owners are advised to park and shut off the engine as quickly as possible if they hear unexpected engine noises, notice a reduction in vehicle power, or see smoke."[66]

104.   On May 26, 2023, Ford submitted its Part 573 Safety Recall Report for Recall No. 23V-380 (the "2023 Report").[67] The 2023 Report specifies that there are 86,656 Ford Escape Hybrid (HEV) and Plug-in Hybrid (PHEV) vehicles, 35,501 Maverick Hybrid vehicles, and 3,165 Corsair Hybrid vehicles subject to the 2023 Expanded Recall.

105.   The 2023 Report also provides specificity concerning the issue which suggest manufacturing defects in the engine itself are causing internal explosions

---

[65] *Id.*

[66] *Id.*

[67] *See* **Exhibit 7**, National Highway Traffic Safety Administration, Part 573 Safety Recall Report No. 23V-380 (May 26, 2023), https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V380-2876.PDF.

that cause engine components called connecting rods to break and be ejected through the engine block or oil pan with tremendous force. In the "23S47 Chronology" document submitted to NHTSA, Ford provides more detail regarding the engine manufacturing issues were related to "crankshaft machining/finishing operations" and "contamination introduced during engine assembly" resulting in "engine failures resulting from a worn crankshaft bearing."[68]

106.   In June 2023, Ford sent letters to all owners of Stall/Fire Risk Vehicles to warn them of the dangerous defect in their vehicles. In these letters, Ford specifies:

| | |
|---|---|
| **What is the issue?** | On your vehicle, the engine could fail prematurely. In the event of an engine failure, significant quantities of engine oil and/or fuel vapor may be released into the under hood environment and may migrate to and/or accumulate near ignition sources. |
| | Engine failure is expected to produce loud noises (example: metal-to-metal clank) audible to the vehicle's occupants. An engine failure will also result in a reduction in available engine power. |
| **What is the risk?** | Engine oil and/or fuel vapor that accumulates near a combustible source may ignite, increasing the risk of a fire. |
| **What will Lincoln and your retailer do?** | Lincoln is working closely with its suppliers to produce parts for this repair. When parts become available, Lincoln will notify you via mail to schedule a service appointment with your retailer for repairs to be |

---

[68] **Exhibit 30**, 23S27 Chronology, https://static.nhtsa.gov/odi/rcl/2023/RMISC-23V380-7289.pdf.

- 53 -

completed free of charge (parts and labor). Parts are anticipated to be available by October 2023.

**What should you do?**   You should safely park and shut off the engine as promptly as possible upon hearing unexpected engine noises, after experiencing a reduction in available engine power, or if smoke is observed emanating from the engine compartment.[69]

107.   On information and belief, Ford failed to adequately research, design, test, and manufacture the Stall/Fire Risk Vehicles before warranting, advertising, promoting, marketing, and selling the Stall/Fire Risk Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

108.   On information and belief, Ford knew or should have known the Stall/Fire Risk Vehicles contained the Spontaneous Stall/Fire Risk and should have warned or disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

### 4.   Permanent Damage Caused by the Failed 2022 Recall

109.   Ford tracked and reported repairs of the 155 vehicles involved in the March 2022 Recall to NHTSA, but apparently did not notify NHTSA that this crankshaft machining defect may be related to the larger recall for crankshaft machining defects three months later under the July 2022 Recall, NHTSA Recall No. 22V-484, Safety Recall No. 22S47, even though this defect occurred in the

---

[69] *See* **Exhibit 31**, Safety Recall Notice 23S27, NHTSA Recall 23V380 (June 2023), https://static.nhtsa.gov/odi/rcl/2023/RIONL-23V380-7298.pdf.

same timeframe. It is possible the manufacturing defect in the March 2022 Recall, Safety Recall 22S10, was not actually contained, but rather a subset of larger crankshaft machining issues related to the subsequent July 2022 Recall, 22S47, and 2023 Recall, 23S27.

110.   Ford plainly knew that the "fix" it implemented with its July 2022 Recall would not resolve the engine manufacturing issue that was causing the block breach and ejection of flammable fluids and vapors from the engines of the Stall/Fire Risk Vehicles. It knew how it could detect that through the inspection protocol it used in the March 2022 Recall, but elected not to. Apparently, Ford hoped that by ejecting the flammable liquid and vapors onto roadways and into garages, dangerous fires might be averted. But that was not the case. Ford itself documented Stall/Fire Risk Vehicles suffering engine compartment fires even after having had the repair associated with the July 2022 Recall completed.

111.   Ford also knew or should have known that the "fix" associated with the July 2022 Recall would cause additional problems, including potential property damage or personal injury from flammable fluids or vapors that escape from the Stall/Fire Risk Vehicles, and that the "fix" would reduce the vehicles' fuel efficiency and engine component longevity. The 2022 Recall "fix" modified the engine undershield and Active Grille Shutters in a way that increased aerodynamic drag, reducing fuel economy. The engine undershield modification reduced the

vehicles' durability in resistance to corrosion, water splash, snow packing, mud packing, and stone pecking. The Active Grille Shutter modification also reduced windshield defroster and vehicle heater performance, as well as increased engine emissions, in cold weather.

## F.    Ford Knew Or Should Have Known Of The Spontaneous Stall/Fire Risk Before It Disclosed The Risk To Plaintiffs

112.   On information and belief, Ford knew or should have known about the Spontaneous Stall/Fire Risk before the Stall/Fire Risk Vehicles went to market. At the very least, Ford certainly knew of the Spontaneous Stall/Fire Risk well before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Stall/Fire Risk Vehicles; (2) the direct and public reports of fires or smoke in 23 Stall/Fire Risk Vehicles; (3) Ford's own investigation of fires in the Stall/Fire Risk Vehicles; and (4) the implementation of the March 2022 Recall.

### 1.    Ford's durability testing should have uncovered the Spontaneous Stall/Fire Risk.

113.   Ford claims to conduct comprehensive and rigorous testing on all its vehicles, saying, "Ford's comprehensive lineup of testing facilities around the world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[70]

---

[70] **Exhibit 32**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, October 7, 2019, FORD.COM, https://media.ford.com/

114.   According to Ford, at their facilities across Thailand, India, Australia, the Middle East, and China, "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[71] These tests include stresses on the engines, moving parts, suspension, and electrical components.[72]

115.   Ford even puts its vehicles through a Total Durability Cycle, described by Ford as "sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[73] "Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this grueling test" and, "[j]ust for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."[74]

116.   On information and belief, the Stall/Fire Risk Vehicles were put through similar durability testing or were designed and built in accordance with the findings of such durability testing. Indeed, as already described, Ford specifically

_____

content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html.

[71] *See id.*

[72] *See id.*

[73] *See id.*

[74] *See id.*

advertised to Maverick consumers with the promise that the Maverick pickup architecture "has endured 19 million miles of customer equivalent durability testing in the real world, lab and proving ground environments."[75] Ford further explains that the pickup has "been tested in extreme weather, taken over off-road durability tests, endured harsh chassis turning, and much more."[76] On information and belief, the Ford Escape and Lincoln Corsair were put through equally stringent testing.

117.   Based on such durability testing, Ford uncovered the Spontaneous Stall/Fire Risk before the Stall/Fire Risk Vehicles were sold to Plaintiffs and putative class members.

### 2.   Ford knew about the Spontaneous Stall/Fire Risk from warranty claims for Stall/Fire Risk Vehicles and its own investigation.

118.   According to its recall chronology, an issue pertaining to 2.5L HEV and PHEV under hood fires was brought to Ford's Critical Concern Review Group for review on May 4, 2022.[77] During the Review Group's analysis from May 4, 2022, through June 8, 2022, the Group included data from 19 field reports of under hood fire or smoke for 2.5L HEV/PHEV vehicles.[78]

---

[75] **Exhibit 10**, Model Year 2022 Ford Maverick brochure, at 10.
[76] *See id.*
[77] **Exhibit 3**.
[78] *Id.*

119.   Ford's investigation continued up until the July 7, 2022 recall and uncovered four more reports of under hood smoke or fires in the Stall/Fire Risk Vehicles.

120.   Ford did not disclose the dates of the 23 fires in the Stall/Fire Risk Vehicles, but on information and belief, Ford learned of at least some of these fires on or before the May 4, 2022 investigation launch.

121.   Moreover, it is obvious that at least the majority of the 2022 model year and all of the 2023 model year Stall/Fire Risk Vehicles were all sold after Ford knew of the Spontaneous Stall/Fire Risk, as the March 2022 Recall and July 2022 had already been issued at the time these vehicles were sold.

122.   All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Stall/Fire Risk Vehicles.[79]

123.   Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or its agents regarding the Stall/Fire Risk Vehicles and the Spontaneous Stall/Fire

---

[79] *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

Risk. At a minimum, Ford received complaints from many scared and angry owners and lessees who learned about the Fire Defect.

124.   However, Ford has yet to address the manufacturing issues associated with the 2.5L HEV/PHEV engines involving engine block or oil pan breach. Instead, Ford has needlessly damaged every Stall/Fire Risk Vehicle that has had the July 2022 Recall "fix" performed by directing that the under-engine shield and Active Grille Shutter of Stall/Fire Risk Vehicles be modified in a failed attempts to redirect and/or purge the engine compartment of the engine oil or fuel vapor.[80] After the modifications were completed, Plaintiffs and class members were left with vehicles that may still catch fire and they may now eject highly flammable oil and vapors if their engines succumb to the manufacturing issues identified. And Ford is not globally offering to buy back the vehicles or even provide loaner or rental vehicles until it can actually fix the manufacturing problem. And though it knows how to issue an inspect and replace recall that would actually resolve this issue, Ford is choosing not to, likely because it will cost too much money.

125.   Because the Stall/Fire Risk Vehicles have engines with manufacturing flaws that may cause the engines to blow up and eject flammable oil and vapors and burst into flames, and Ford is not fixing this and has instead decreased the fuel efficiency of the Stall/Fire Risk Vehicles and created the further risk that fluids and

---

[80] *Id.* at 5.

vapors will leak into garages, roadways and the environment, all owners and

lessees of the Stall/Fire Risk Vehicles have suffered ascertainable loss.

**G.    After Instituting The "Fix," Ford Failed To Conduct New Mileage Tests To Ensure That Its Mileage Estimates Were Not Adversely Affected**

126.    As described above, Ford knew that active grille shutters and

underbody shields reduce aerodynamic drag on its vehicles, improve fuel

efficiency.[81] Therefore, in removing four blinds from the Stall/Fire Risk Vehicles'

Active Grille Shutters as part of the "fix," Ford knew the vehicles' estimated gas

mileage could be reduced. But despite this knowledge, Ford did not conduct new

mileage tests to ensure that the mileage estimates it reported to the Environmental

Protection Agency ("EPA") were accurate, as it was required to do.[82]

127.    The potential impact on mileage of removing active grille shutter

blinds has not been lost on consumers. For instance, one Stall/Fire Risk Vehicle

owner posted in a Maverick forum, "I'm NOT OK with removing blinds from the

active grill shutters. They are there for a reason. Specifically, the AGS reduces

emissions and improves aerodynamics. Is there really no other solution to this

---

[81] **Exhibit 14**, *Active Grille Shutter*, Ford, https://www.ford.com.au/technology/active-grill-shutter (last accessed Oct. 7, 2022).

[82] The EPA "requires auto manufacturers to change or update their MPG (miles per gallon) values on fuel economy labels (window stickers) if information comes to light that show that the values are too high." **Exhibit 33**, *Data on Cars Used for Testing Fuel Economy*, EPA, https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-used-testing-fuel-economy (last accessed Oct. 7, 2022).

problem?!?!"[83] Another user asks whether this fix "is the best they can do or is it the quickest and cheapest????"[84] And a user in a separate thread asked, "Has anyone felt like their highway miles has taken a hit after this? I don't have enough data to tell, so I'm not sure if it's the heat, or this recall. But I feel like I'm down 3-4 MPG on the highway."[85]

128.    By failing to conduct new mileage tests to ensure that the touted mileage of the Stall/Fire Risk Vehicles remains accurate even after the "fix," Ford is actively concealing information from class members, including Plaintiffs, about the actual fuel efficiency of their Stall/Fire Risk Vehicles.

---

[83] **Exhibit 34**, *New Maverick Recall: 2.5 Hybrid Engine Fire Hazard [Updated w/ Safety Recall Notice to Dealers]*, Maverick Truck Club, at online forum comment #51 (July 8, 2022), https://www.mavericktruckclub.com/forum/threads/new-maverick-recall-2-5-hybrid-engine-fire-hazard-updated-w-safety-recall-notice-to-dealers.17459/page-4.

[84] **Exhibit 35**, *New Maverick Recall: 2.5 Hybrid Engine Fire Hazard [Updated w/ Safety Recall Notice to Dealers]*, Maverick Truck Club, at online forum comment #80 (July 8, 2022), https://www.mavericktruckclub.com/forum/threads/new-maverick-recall-2-5-hybrid-engine-fire-hazard-updated-w-safety-recall-notice-to-dealers.17459/page-6.

[85] **Exhibit 36**, *New Maverick Recall: 2.5 Hybrid Engine Fire Hazard [Updated w/ Safety Recall Notice to Dealers]*, Maverick Truck Club, at online forum comment #63 (Sept. 2, 2022), https://www.mavericktruckclub.com/forum/threads/2022-maverick-hybrid-safety-recall-engine-oil-fuel-vapor-may-leak-in-event-of-engine-failure-recall-22s47-nhtsa-recall-22v484.19340/page-5.

**H.    After Instituting The "Fix," Ford Failed To Conduct Tests To Ensure That Durability And Longevity Were Not Adversely Affected By The Perforated Engine Undershield**

129.   Ford knew that the engine undershield reduces environmental wear and tear on the engine compartment. The engine undershield is designed to provide aerodynamic drag reduction as well as protect the engine and powertrain from road debris, snow packing, corrosive salt spray, and road splash. The engine undershield is part of an integrated system of body shields and air deflectors, as illustrated in the service parts diagram for a Ford Escape (the engine undershield is part "6775," in green).[86] Ford would have completed extensive vehicle durability testing protocols for corrosion testing, snow packing, stone pecking, mud bath, high-pressure spray, and road water splash, as well as vehicle noise acceptance testing for the Ford Escape, Ford Maverick, and Lincoln Corsair with the engine undershield in place, as designed. Ford advertises their vehicle quality

---

[86] **Exhibit 37**, Radiator Support Splash Shield, Part 6775, Fordparts.com, https://parts.ford.com/shop/en/us/body/other-body-related-parts-front/radiator-support-splash-shield-engine-compartment-splash-shield-fwd-front-lower-p-lx6z6775s?pdp=y#/sectionId:190132118.

improvements using these types of durability tests.[87,88,89] Ford did not conduct

subsequent durability tests to assess the negative impact on vehicle durability and

operation (noise) with a modified engine undershield.



---

[87] **Exhibit 38**, "Robotic Butts, High-Pressure Car Washes and Gravel-Testing Show MustangMach-E Stands Up to Wear and Tear," Ford.com (Aug. 13, 2021), https://media.ford.com/content/fordmedia/feu/en/news/2021/08/13/robotic-butts--high-pressure-car-washes-and-gravel-testing-show-.html.

[88] **Exhibit 39**, "From Acid Baths to Power Hop Hill, 10 Ways Ford Torture-Tested the 2015 F-150," Ford.com (Apr. 9, 2014), https://media.ford.com/content/fordmedia/fna/us/en/news/2014/04/09/10-ways-ford-torture-tested-the-2015-F150.html.

[89] **Exhibit 40**, LommelProvingGround, Fordlpg.com, https://www.fordlpg.com/en/indexjs.htm?page=main_fac_dur.htm (last accessed Aug. 8, 2023).

I.   **Class Members Could Have Been Made Aware Of The Spontaneous Stall/Fire Risk At The Point Of Sale**

130.   Plaintiffs and all putative class members were necessarily exposed to Ford's omissions before purchasing the Stall/Fire Risk Vehicles because they each interacted with an authorized Ford dealer at the point of sale. These dealers could have disclosed the omitted information to each class member, but they failed to do so. As a district court affirmed in another consumer class action case against Ford, all class members in that case would have "been aware of a disclosure" from Ford about the defect at the point of sale because class members "interact[ed] with an authorized Ford dealer prior to purchase." *Daniel v. Ford Motor Co.*, 2016 WL 8077932, at *8 (E.D. Cal. Sept. 23, 2016). The same is true here.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

A.   **Discovery Rule Tolling**

131.   Because Ford (i) omitted the existence of the Spontaneous Stall/Fire Risk and (ii) omitted the fact that the July 2022 Recall repair does not fix the manufacturing flaw and instead creates additional risks and reduces fuel efficiency, class members had no way of knowing about the potential danger of the Stall/Fire Risk Vehicles and the lack of a *bona fide* repair during the recall.

132.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Ford was not revealing the existence of the

Spontaneous Stall/Fire Risk complained of herein and not repairing it during the recall.

**133.** Plaintiffs and putative class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable fire risk of the Stall/Fire Risk Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

134.  For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Stall/Fire Risk Vehicles.

**B.   Estoppel**

135.  Ford was under a continuous duty to disclose to Plaintiffs and putative class members the true character, quality, and nature of the fire risk of the Stall/Fire Risk Vehicles.

136.  Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Stall/Fire Risk Vehicles and it knowingly, affirmatively, and actively concealed or recklessly

disregarded the true nature, quality, and character of the repair it was performing under the recall of the Stall/Fire Risk Vehicles.

137.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

138.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class and Subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased model year 2020-2023 Ford Escape, 2022-2023 Ford Maverick, or 2021-2023 Lincoln Corsair vehicles (the "Stall/Fire Risk Vehicles").

> **California Subclass**: All persons or entities who purchased or leased one or more of the Stall/Fire Risk Vehicles in the State of California.

> **Arizona Subclass**: All persons or entities who purchased or leased one or more of the Stall/Fire Risk Vehicles in the State of Arizona.

> **Missouri Subclass**: All persons or entities who purchased or leased one or more of the Stall/Fire Risk Vehicles in the State of Missouri.

> **Nebraska Subclass**: All persons or entities who purchased or leased one or more of the Stall/Fire Risk Vehicles in the State of Nebraska.

> **Wisconsin Subclass**: All persons or entities who purchased or leased one or more of the Stall/Fire Risk Vehicles in the State of Wisconsin.

139.   Plaintiffs assert claims under the laws of each state set forth below.

140.    Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Stall/Fire Risk Vehicles, as well as any personal injury or property damages claims resulting from fluid or vapor that is ejected from a Stall/Fire Risk Vehicle. Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

141.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

142.    This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

143.    **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Class and Subclasses are so numerous and geographically dispersed that individual joinder of all class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least 125,322 or more

Stall/Fire Risk Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and published notice.

144.   **Commonality and Predominance**: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

a.   Whether Ford engaged in the conduct alleged herein;

b.   Whether the Spontaneous Stall/Fire Risk creates an unreasonable risk of fires in the Stall/Fire Risk Vehicles;

c.   When Ford first knew about the Spontaneous Stall/Fire Risk;

d.   Whether Ford designed, manufactured, marketed, and distributed the Stall/Fire Risk Vehicles with manufacturing flaws or defective component(s) that cause the engines to blow up and eject components through the block and oil pan, which can lead to under hood fire;

e.   Whether the July 2022 recall and "fix" degraded the efficiency and durability of the Stall/Fire Risk Vehicles;

f.   Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

g.   Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

h.   Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

i.     Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

145.   **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

146.   **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class and Subclasses will be fairly and adequately protected by Plaintiffs and their counsel.

147.   **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the

Class and Subclasses to individually seek redress for Ford's wrongful conduct.

Even if Class and Subclass members could afford individual litigation, the court

system could not. Individualized litigation creates a potential for inconsistent or

contradictory judgments and increases the delay and expense to all parties and the

court system. By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.**     **Nationwide Claims**

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

148.    Plaintiffs re-allege and incorporate by reference all paragraphs as

though fully set forth herein.

149.    Plaintiffs bring this claim on behalf of the Nationwide Class.

150.    This Court has jurisdiction to decide claims brought under 15 U.S.C.

§ 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

151.    The Stall/Fire Risk Vehicles are "consumer products" within the

meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and

Nationwide Class members are consumers because they are persons entitled under

applicable state law to enforce against the warrantor the obligations of its implied warranties.

152.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

153.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

154.   Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Stall/Fire Risk Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

155.   Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs and Nationwide Class members under 15 U.S.C. § 2310(d)(1). Without limitation, the Stall/Fire Risk Vehicles share a common defect in that they all suffer from an engine manufacturing defect that can cause the engines to blow up and stall, and expel flammable liquids and vapors, which can result in fire, causing an unreasonable risk of death, serious bodily harm, and

property damage to owners and lessees of the Stall/Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Stall/Fire Risk renders the Stall/Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

156.   As discussed herein, on information and belief, Ford knew or should have known about the Spontaneous Stall/Fire Risk from its own durability testing of the Stall/Fire Risk Vehicles before launching the Stall/Fire Risk Vehicles. Ford omitted information about the engine defect and its consequences from Plaintiffs and class members, misrepresented the qualities of the Stall/Fire Risk Vehicles, and has failed to provide a fix for the engine defect.

157.   Ford further breached its implied warranties, as described herein, and is therefore liable to Plaintiffs and Nationwide Class members under 15 U.S.C. § 2310(d)(1) because it implemented a recall and "repair" that did not actually repair the Spontaneous Stall/Fire Risk and instead degraded the fuel efficiency and durability of the Stall/Fire Risk Vehicles and created further risks and hazards from leaking oil and vapor, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Stall/Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The deceptive nature of the repair issued by

Ford to address the Spontaneous Stall/Fire Risk rendered the Stall/Fire Risk

Vehicles unmerchantable and unfit for their ordinary use of driving when they

were sold or leased, and at all times thereafter.

158.   As discussed herein, Ford knew at the time it issued the recall and

repair that the repair would not address the manufacturing defect in the Stall/Fire

Risk Vehicles. Ford also knew how to properly address the defective engine

manufacturing by having its dealers inspect the engines for signs of the defect and

replace the engines, if warranted. Likely because an inspect and repair recall would

have cost Ford 5-10 times more than the dubious "fix" it issued in July 2022, Ford

chose not address the actual engine defect at all. Ford omitted information about

the recall repair and its consequences from Plaintiffs and class members,

misrepresented the qualities of the recall and repair of the Stall/Fire Risk Vehicles,

and has failed to provide a fix for the manufacturing defect.

159.   Ultimately, Ford was forced to admit that its July 2022 Recall "fix"

was entirely ineffective at mitigating the risk of Stall (by design, since it ignored

this risk) and was also ineffective at preventing blown engines in the Stall/Fire

Risk Vehicles from causing under hood fires. Ford has expanded and replaced the

July 2022 Recall, but it does not offer any repair or fix for the over 125,000

Stall/Fire Risk Vehicles that it has sold with this dangerous defect.

160.   Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Stall/Fire Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

161.   Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

162.   Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Stall/Fire Risk Vehicles were defective and that the Stall/Fire Risk Vehicles had engines that could prematurely fail and blow up, causing stalls and could catch on fire when used as intended. And Ford knew this long before Plaintiffs and class members knew or should have known. Ford further knew that the recall repair it deployed did not actually mitigate or fix the manufacturing defect that results in the Spontaneous Stall/Fire Risk. Ford failed to disclose this risk to Plaintiffs and class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

163.   Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are an intended third-

party beneficiary of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Stall/Fire Risk Vehicles and have no rights under the warranty agreements provided with the Stall/Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Stall/Fire Risk Vehicles are dangerous instrumentalities due to the Spontaneous Stall/Fire Risk, as under hood smoke and fires present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Stall/Fire Risk Vehicles.

164.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure. However, Plaintiffs have, in fact sent multiple demand letters to Ford describing this defect and demanding a bona fide repair.

165.    Plaintiffs would suffer economic hardship if they returned their Stall/Fire Risk Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Stall/Fire Risk Vehicles by retaining them.

166.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Stall/Fire Risk Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Nationwide Class members in connection with the commencement and prosecution of this action.

167.   Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Spontaneous Stall/Fire Risk in their Stall/Fire Risk Vehicles.

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(Common Law)**

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

168.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

169. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Subclasses.

170. A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Stall/Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Stall/Fire Risk Vehicles; (b) knowingly concealed material information in connection with the sale or lease of the Stall/Fire Risk Vehicles; (c) knowingly failed to disclose material information in connection with the sale or lease of the Stall/Fire Risk Vehicles; or (d) failed to disclose material information concerning the recall repair for the Spontaneous Stall/Fire Risk; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

171. Ford concealed and suppressed material facts concerning the serious safety issues with Plaintiffs' vehicles. Ford concealed and suppressed material facts concerning the recall repair of Plaintiffs' vehicles.

172. Ford sold the Stall/Fire Risk Vehicles to Plaintiffs without disclosing the Spontaneous Stall/Fire Risk and concealed and suppressed the risk from regulators and consumers.

173.   Ford concealed and suppressed the Spontaneous Stall/Fire Risk with the intent to deceive Plaintiffs.

174.   Ford did so in order to falsely assure purchasers, lessees, and owners of the Stall/Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Stall/Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

175.   Ford had a duty to disclose the Spontaneous Stall/Fire Risk because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety, high performance, and quality of the Stall/Fire Risk Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Stall/Fire Risk. Ford also had a duty to disclose that the Stall/Fire Risk could cause engines to suddenly stall and lose power, putting vehicle occupants in grave danger of an accident. And it had a duty to disclose that this stall danger was not addressed at all

- 79 -

by the recall repair that it issued in July 2022. Finally, once the Stall/Fire Risk

Vehicles were on the road, Ford had a duty to monitor the Stall/Fire Risk Vehicles

under the TREAD Act and implementing regulations, including the duty to

promptly notify consumers of known safety defects.

176.   Ford concealed and/or suppressed these material facts, in whole or in

part, to protect its profits and avoid recalls that would hurt Ford's image and cost

Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

177.   On information and belief, Ford has still not made full and adequate

disclosure and continues to defraud Plaintiffs and the Nationwide Class and

conceal material information regarding the Spontaneous Stall/Fire Risk. This is

especially true in the context of Ford's purported "fix" from its July 2022 Recall,

which did not actually inspect or fix the defective engines but sought (and failed)

only to mitigate the risk of an under hood fire *after* the Stall/Fire Risk Vehicle

suffered a blown engine, while reducing the vehicle's fuel efficiency and

durability.

178.   Plaintiffs were unaware of these omitted material facts and would

have acted differently if they had known of the concealed and/or suppressed facts.

If Plaintiffs knew of the Spontaneous Stall/Fire Risk and of Ford's proposed "fix,"

they would not have purchased their Stall/Fire Risk Vehicles or would have paid

less for them. Plaintiffs' actions at the time they purchased their Stall/Fire Risk

Vehicles were justified because Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

179.   Because of the concealment and/or suppression of the facts, Plaintiffs and other class members sustained damage. In purchasing their Stall/Fire Risk Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the Spontaneous Stall/Fire Risk, and because they own vehicles that have diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the Spontaneous Stall/Fire Risk and the nature of the July 2022 Recall "fix", which fixed nothing and instead degraded fuel efficiency and durability of the Stall/Fire Risk Vehicles. Those Nationwide Class members who sold their dangerous Stall/Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does).

180.   Accordingly, Ford is liable to Plaintiffs and the Nationwide Class for damages in an amount to be proven at trial.

181.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and class members' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### UNJUST ENRICHMENT
### (Common Law)

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

182.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

183.    Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

184.    This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

185.    Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

186.    Ford has benefitted from selling, leasing, and distributing the Stall/Fire Risk Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and class members have overpaid for the Stall/Fire Risk Vehicles and been forced to pay other costs.

187.    Ford has also benefitted from purposefully avoiding the cost associated with actually inspecting the engines in the Stall/Fire Risk Vehicles to

determine which have the manufacturing defect that causes blown engines, and replacing them. Plaintiffs and Nationwide Class members bear the costs of Ford's avoidance as they are forced to wonder whether their engine is one that will blow up, because Ford refuses to spend the approximately $60 million it will cost to inspect all of the Stall/Fire Risk Vehicles.

188.   Thus, Plaintiffs and the Nationwide Class conferred a benefit on Ford.

189.   It is inequitable for Ford to retain these benefits.

190.   Plaintiffs and Nationwide Class members were not aware of the true facts about the Stall/Fire Risk Vehicles and did not benefit from Ford's conduct described herein.

191.   Ford knowingly accepted the benefits of its unjust conduct.

192.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.    State-Specific Claims**

**1.    California**

### COUNT IV

### VIOLATION OF THE CALIFORNIA
### CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

**(Alleged by Plaintiff Nishon on behalf of the California Subclass)**

193.    Plaintiff Nishon ("Plaintiff" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

194.    Plaintiff brings this claim on behalf of himself and the California Subclass.

195.    Ford is a "person" as defined in California Civil Code § 1761(c).

196.    Plaintiff and California Subclass members are "consumers" as defined in California Civil Code § 1761(d).

197.    Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA") through the practices described herein, and by omitting the true facts about Spontaneous Stall/Fire Risk and misrepresenting and misleading Plaintiff and the California Subclass about the Stall/Fire Risk Vehicles, along with omitting the risks, costs, and monetary damage resulting from the Spontaneous Stall/Fire Risk and the inadequate recall repair. These acts and practices violate, at a minimum, the following sections of the

CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

198.   Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public and imposed a serious safety risk on the public.

199.   Ford knew or should have known that its conduct violated the CLRA.

200.   Ford knew or should have known about the Spontaneous Stall/Fire Risk affecting the Stall/Fire Risk Vehicles owned or leased by Plaintiff and California Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires or smoke in 23 Stall/Fire Risk Vehicles; and (iii) Ford's own investigation of fires in the Stall/Fire Risk Vehicles.

201.   Ford knew that the recall repair it implemented did nothing to address the manufacturing flaw that causes the Spontaneous Stall/Fire Risk affecting the Stall/Fire Risk Vehicles owned or leased by Plaintiff and California Subclass members.

202.   In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Stall/Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Stall/Fire Risk Vehicles, specifically the existence of the Spontaneous Stall/Fire Risk, as alleged herein. Ford omitted the fact of the Spontaneous Stall/Fire Risk from Plaintiff and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Stall/Fire Risk Vehicles given the existence of the Spontaneous Stall/Fire Risk in them. Ford also misrepresented the efficacy and effectiveness of the recall repair it issued for the Stall/Fire Risk Vehicles.

203.   Ford owed Plaintiff and the California Subclass a duty to disclose the true safety and reliability of the Stall/Fire Risk Vehicles and the adequacy of the recall repair because Ford:

a.   Possessed exclusive knowledge about the Spontaneous Stall/Fire Risk and the nature of its recall repair;

b.   Omitted the foregoing from Plaintiff and the California Subclass;

c.   Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Stall/Fire Risk Vehicles, while withholding material facts from Plaintiff and the California Subclass that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the Spontaneous Stall/Fire Risk.

204.   In failing to disclose the Spontaneous Stall/Fire Risk and associated safety risks and repair costs that result from it, Ford has misrepresented the Stall/Fire Risk Vehicles, omitted disclosure the Spontaneous Stall/Fire Risk, and breached its duty to disclose.

205.   The facts omitted and misrepresented by Ford to Plaintiff and California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Stall/Fire Risk Vehicles or to pay a lesser price. Had Plaintiff and California Subclass members known about the defective nature of the Stall/Fire Risk Vehicles, they would not have purchased or leased the Stall/Fire Risk Vehicles or would have paid less for them.

206.   Ford's violations of the CLRA present continuing risk and harm to Plaintiff, the California Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate fix for the engines that leak oil and vapors. Furthermore, Ford's "fix" raises additional safety concerns and reduces the vehicles' fuel efficiency.

207.   On or about August 15, 2022, and August 7, 2023, Plaintiffs' undersigned counsel provided Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Stall/Fire Risk Vehicles.

208.   Plaintiff and California Subclass members' injuries were proximately caused by Ford's deceptive business practices.

209.   Plaintiff and California Subclass members seek all relief available under the CLRA, including equitable relief, damages, and attorneys' fees.

## COUNT V
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200)

**(Alleged by Plaintiff Nishon on behalf of the California Subclass)**

210.   Plaintiff Nishon ("Plaintiff" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

211.   Plaintiff brings this claim on behalf of himself and the California Subclass.

212.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

213.   In the course of its business, Ford engaged in deceptive acts or practices with the marketing and sale or lease of the Stall/Fire Risk Vehicles because it misrepresented and omitted material facts concerning the Stall/Fire Risk Vehicles, specifically the existence of the Spontaneous Stall/Fire Risk, as alleged

herein. Ford omitted the fact of the Spontaneous Stall/Fire Risk from Plaintiff and

California Subclass members. Ford also mispresented the safety, quality,

functionality, and reliability of the Stall/Fire Risk Vehicles given the existence of

the Spontaneous Stall/Fire Risk in them. Ford also misrepresented the efficacy and

effectiveness of the recall repair of the Stall/Fire Risk Vehicles.

214.   Ford engaged in unfair competition and unfair, unlawful, or fraudulent

business practices through the conduct, statements, and omissions described

herein, and by omitting the Spontaneous Stall/Fire Risk in the Stall/Fire Risk

Vehicles from Plaintiff and California Subclass members, along with omitting the

risks, costs, and monetary damage resulting from the defect. Ford should have

disclosed this information because it was in a superior position to know the true

facts related to the Spontaneous Stall/Fire Risk, and Plaintiff and California

Subclass members could not reasonably be expected to learn or discover the true

facts related to the Spontaneous Stall/Fire Risk.

215.   The Spontaneous Stall/Fire Risk causes blown engines, stalls and

catastrophic fire in the Stall/Fire Risk Vehicles, and this constitutes a safety issue

that triggered Ford's duty to disclose the safety issue to consumers.

216.   Ford's acts and practices misled and deceived Plaintiff and are likely

to deceive the public. In failing to disclose the Spontaneous Stall/Fire Risk and

omitting other material facts from Plaintiff and California Subclass members, Ford

breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff and California Subclass members. Ford's omissions and misrepresentations concerned information that was material to Plaintiff and California Subclass members, as it would have been to all reasonable consumers.

217.   The injuries suffered by Plaintiff and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and California Subclass members could or should have reasonably avoided.

218.   Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

219.   Plaintiff and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

220.   Plaintiff seek to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT VI
## VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, et seq.)

**(Alleged by Plaintiff Nishon on behalf of the California Subclass)**

221.   Plaintiff Nishon ("Plaintiff" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

222.   Plaintiff brings this claim on behalf of himself and the California Subclass.

223.   California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

224.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of

reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff and California Subclass members.

225.   Ford violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Stall/Fire Risk Vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

226.   Plaintiff and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Stall/Fire Risk Vehicles, Plaintiff and California Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Stall/Fire Risk Vehicles were sold or leased with the Spontaneous Stall/Fire Risk. Had Plaintiff and California Subclass members known this, they would not have purchased or leased their Stall/Fire Risk Vehicles or paid as much for them. Accordingly, Plaintiff and California Subclass members overpaid for their Stall/Fire Risk Vehicles and did not receive the benefit of their bargain.

227.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a

pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

228.    Plaintiff, individually and on behalf of the California Subclass members, request this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiff and California Subclass members any money Ford acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

**COUNT VII**

**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)**

**(Alleged by Plaintiff Nishon on behalf of the California Subclass)**

229.    Plaintiff Nishon ("Plaintiff" for the purposes of this claim) and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

230.    Plaintiff brings this claim on behalf of himself and the California Subclass.

231.    Plaintiff and California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

232.   The Stall/Fire Risk Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

233.   Ford is the "manufacturer" of the Stall/Fire Risk Vehicles within the meaning of Cal. Civ. Code § 1791(j).

234.   Ford impliedly warranted to Plaintiff and the California Subclass that the Stall/Fire Risk Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Stall/Fire Risk Vehicles do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

235.   Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact made on the container or label.

236.   The Stall/Fire Risk Vehicles were not merchantable when sold or leased because they pose an unreasonable risk of fires due to the Spontaneous Stall/Fire Risk as described herein. Without limitation, the Stall/Fire Risk Vehicles share a common defect in that they all suffer from an issue in the engine

compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Stall/Fire Risk Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Stall/Fire Risk rendered the Stall/Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

237.   Ford breached the implied warranty of merchantability by selling Stall/Fire Risk Vehicles containing a defect leading to under hood fires during ordinary operating conditions. This defect has deprived Plaintiff and California Subclass members of the benefit of their bargain.

238.   Plaintiff and the California Subclass have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between them. Nonetheless, privity is not required here because Plaintiff and the California Subclass are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Stall/Fire Risk Vehicles and have no rights under the warranty agreements provided with the Stall/Fire Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers.

239.    Notice of breach is not required because Plaintiff and California Subclass members did not purchase their automobiles directly from Ford. Nonetheless, Plaintiff's counsel sent notification to Ford on or about August 15, 2022, and August 7, 2023.

240.    Plaintiff and California Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Stall/Fire Risk Vehicles to Plaintiff and California Subclass members.

241.    As a direct and proximate result Ford's breach of the implied warranty of merchantability, Plaintiff and California Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiff and California Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Stall/Fire Risk Vehicles.

242.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Stall/Fire Risk Vehicles, or the overpayment or diminution in value of their Stall/Fire Risk Vehicles.

243.    Under Cal. Civ. Code § 1794, Plaintiff and California Subclass members are entitled to costs and attorneys' fees.

**2.     Arizona**

## COUNT VIII

### VIOLATIONS OF THE CONSUMER FRAUD ACT
### (Ariz. Rev. Stat. § 44-1521, *et seq.*)

**(Alleged by Plaintiffs James Capps and Joseph Vaillancourt
on behalf of the Arizona Subclass)**

244.    Plaintiffs and the Arizona Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

245.    Plaintiffs bring this claim on behalf of themselves and the Arizona Subclass.

246.    Ford, Plaintiffs, and the Subclasses are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

247.    The Stall/Fire Risk Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

248.    Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

249.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived

- 97 -

or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

250. Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

251. In the course of its business, Ford concealed the Spontaneous Stall/Fire Risk in the Stall/Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Stall/Fire Risk Vehicles.

252. By failing to disclose and by actively concealing the Spontaneous Stall/Fire Risk in the Stall/Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and fit for use, Ford engaged in unfair and deceptive business practices in violation of the Arizona CFA.

253. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Stall/Fire Risk Vehicles.

254.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclasses members, about the true safety and reliability of their vehicles.

255.   Ford intentionally and knowingly misrepresented material facts regarding the Stall/Fire Risk Vehicles with the intent to mislead Plaintiffs and the Subclasses.

256.   Ford knew or should have known that its conduct violated the Arizona CFA.

257.   As alleged above, Ford made material statements about the safety and reliability of the Stall/Fire Risk Vehicles.

258.   Ford owed Plaintiffs and the Subclasses a duty to disclose the true safety and reliability of the Stall/Fire Risk Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Spontaneous Stall/Fire Risk;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclasses;

    c.    Made incomplete representations about the safety and reliability of the Stall/Fire Risk Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclasses that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

259.   Because Ford fraudulently concealed the Spontaneous Stall/Fire Risk, as well as the true nature of the Stall/Fire Risk Vehicles, Plaintiffs were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiffs been aware of the defects in their vehicles, they would have either not have bought or leased their vehicles or would have paid less for them.

260.   Ford's concealment of the defects in the Stall/Fire Risk Vehicles was material to Plaintiffs and the Subclasses.

261.   Plaintiffs and the Subclasses suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Stall/Fire Risk. Plaintiffs and Subclasses members either would have paid less for their vehicles or would not have purchased or leased them at all.

262.   Ford's violations present a continuing risk to Plaintiffs and the Subclasses as well as to the general public. In particular and as alleged herein, Ford has yet to offer any *bona fide* fix for the Stall/Fire Risk Vehicles. Ford's unlawful acts and practices complained of herein affect the public interest.

263.   As a direct and proximate result of Ford's violations of the Arizona CFA, Plaintiffs and the Subclasses have suffered injury-in-fact and/or actual damage as alleged above.

264.   Plaintiffs seek monetary relief against Ford in an amount to be determined at trial. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct with an evil mind.

265.   Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT IX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER ARIZONA LAW
### (Ariz. Rev. Stat. § 47-2314)

**(Alleged by Plaintiffs James Capps and Joseph Vaillancourt on behalf of the Arizona Subclass)**

266.   Plaintiffs and the Arizona Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

267.   Plaintiffs bring this claim on behalf of themselves and the Arizona Subclass.

268.   Ford is and was at all relevant times a merchant with respect to motor vehicles under Ariz. Rev. Stat. § 47-2014.

269.   Under Arizona law, an implied warranty of merchantability attaches to the Stall/Fire Risk Vehicles. Ariz. Rev. Stat. § 47-2314.

270.    The Stall/Fire Risk Vehicles were not merchantable when sold or leased because their engines are prone to blow up, and pose an unreasonable risk of stall and fire due to the Spontaneous Stall/Fire Risk as described herein.

271.    Without limitation, the Stall/Fire Risk Vehicles share a common defect in that they are all equipped with an engine that can prematurely blow up causing spontaneous stall and engine fire, which creates a risk of death, serious bodily harm and/or property damage to lessees and owners of the Stall/Fire Risk Vehicles as well as their passengers and bystanders. Without limitation, the Stall/Fire Risk Vehicles share a common defect in that they are all equipped with an engine that can prematurely blow up and cause internal components to breach the engine block or oil pan, which also makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Stall/Fire Risk Vehicles as well as their homes, passengers and bystanders. These defects render the Stall/Fire Risk Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

272.    Plaintiffs and Subclasses members were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Stall/Fire Risk Vehicles to Plaintiffs and Arizona Subclasses members.

273.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and Arizona Subclasses members have been damaged in an amount to be determined at trial.

### 3.    Nebraska

### COUNT X

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### (Neb. Rev. Stat. § 59-1601 *et seq.*)

### (Alleged by Plaintiff Raymond Dynne III
### on behalf of the Nebraska Subclass)

274.    Plaintiff Raymond Dynne ("Plaintiff" for purposes of all Nebraska Class Counts) incorporates by reference all paragraphs as though fully set forth herein.

275.    This claim is brought by Plaintiff on behalf of the Nebraska Subclass.

276.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602.

277.    Ford, Plaintiff, and Nebraska Subclass members are "person[s]" under NEB. REV. STAT. § 59-1601(1).

278.    Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

279.    In the course of its business, Ford willfully failed to disclose and actively concealed the Spontaneous Stall/Fire Risk, and otherwise engaged in

activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Stall/Fire Risk Vehicles.

280.   Ford was aware that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

281.   By marketing its vehicles as safe, reliable, and of high quality, Ford engaged in deceptive business practices in violation of the Nebraska CPA.

282.   In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Stall/Fire Risk. Ford compounded the deception by repeatedly asserting that the Stall/Fire Risk Vehicles were safe, reliable, and of high quality.

283.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, performance and value of the Stall/Fire Risk Vehicles.

284.   Ford intentionally and knowingly misrepresented material facts regarding the Stall/Fire Risk Vehicles with an intent to mislead Plaintiffs.

285.   Ford knew or should have known that its conduct violated the

Nebraska CPA.

286.   As alleged above, Ford made material statements about the safety and

utility of the Stall/Fire Risk Vehicles that were either false or misleading.

287.   Ford owed Plaintiffs a duty to disclose the true safety, performance,

and reliability of the Stall/Fire Risk Vehicles because Ford:

> a.   Possessed exclusive knowledge about the defects in the
>       Stall/Fire Risk Vehicles;
>
> b.   Intentionally concealed the foregoing from Plaintiffs;
>
> c.   Made incomplete representations about the safety and
>       reliability of the Stall/Fire Risk Vehicles, while
>       purposefully withholding material facts from Plaintiffs
>       that contradicted these representations; and/or
>
> d.   Made incomplete representations about the efficacy of
>       the July 2022 Recall, while purposefully withholding
>       material facts from Plaintiffs that contradicted these
>       representations; and/or
>
> e.   Had duties under the TREAD Act and related regulations
>       to disclose and remedy the defects well prior to the issue
>       of its confounding recall notice in 2022.

288.   Ford fraudulently concealed the Spontaneous Stall/Fire Risk and the

true performance of the Stall/Fire Risk Vehicles.

289.   The true performance and safety of the Stall/Fire Risk Vehicles were

material to Plaintiffs.

290.   Plaintiffs suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased the Stall/Fire Risk Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Nebraska CPA.

291.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Nebraska CPA. All owners of the Stall/Fire Risk Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

292.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

293.   As a direct and proximate result of Ford's violations of the Nebraska CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

294.   Because Ford's conduct caused injury to Nebraska Plaintiff's property through violations of the Nebraska CPA, Nebraska Plaintiff seeks recovery of actual damages as well as enhanced damages up to $1,000, an order enjoining Ford's unfair or deceptive acts and practices, costs of Court, reasonable attorneys'

fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

295.   Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

### 4.   Missouri

## COUNT XI

## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, *et seq.*)

### (Alleged by Plaintiff Hilburg on behalf of the Missouri Subclass)

296.   Plaintiff and the Missouri Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

297.   Plaintiff brings this action on behalf of himself and the Missouri Subclass ("Plaintiffs," for the purposes of this claim).

298.   Plaintiffs are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

299.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

300.   In the course of its business, Ford willfully failed to disclose and actively concealed the Spontaneous Stall/Fire Risk, and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Stall/Fire Risk Vehicles.

301.   Ford was aware that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

302.   By marketing its vehicles as safe, reliable, and of high quality, Ford engaged in deceptive business practices in violation of the Missouri MPA.

303.   In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Stall/Fire Risk. Ford compounded the deception by repeatedly asserting that the Stall/Fire Risk Vehicles were safe, reliable, and of high quality.

304.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, performance and value of the Stall/Fire Risk Vehicles.

305.   Ford intentionally and knowingly misrepresented material facts regarding the Stall/Fire Risk Vehicles with an intent to mislead Plaintiffs.

306.   Ford knew or should have known that its conduct violated the Missouri MPA.

307.   As alleged above, Ford made material statements about the safety and utility of the Stall/Fire Risk Vehicles that were either false or misleading.

308.   Ford owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Stall/Fire Risk Vehicles because Ford:

      a.    Possessed exclusive knowledge about the defects in the Stall/Fire Risk Vehicles;

      b.    Intentionally concealed the foregoing from Plaintiffs;

      c.    Made incomplete representations about the safety and reliability of the Stall/Fire Risk Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      d.    Made incomplete representations about the efficacy of the July 2022 Recall, while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

      e.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

309.   Ford fraudulently concealed the Spontaneous Stall/Fire Risk and the true performance of the Stall/Fire Risk Vehicles.

310.   The true performance and safety of the Stall/Fire Risk Vehicles were material to Plaintiffs.

311.   Plaintiffs suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased the Stall/Fire Risk Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Missouri MPA.

312.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of the Stall/Fire Risk Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

313.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

314.   As a direct and proximate result of Ford's violations of the Missouri MPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

315.   Ford is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive

relief enjoining Ford's unfair and deceptive practices, and any other just and proper

relief under Mo. Rev. Stat. § 407.025.

    **5.**    **Wisconsin**

## COUNT XII

### VIOLATIONS OF THE WISCONSIN
### DECEPTIVE TRADE PRACTICES ACT
### (Wis. Stat. § 110.18)

**(Alleged by Plaintiff Simmons on behalf of the Wisconsin Subclass)**

316.   Plaintiff and the Wisconsin Subclass reallege and incorporate by

reference all paragraphs as though fully set forth herein.

317.   Plaintiff brings this action on behalf of himself and the Wisconsin

Subclass ("Subclass," for the purposes of this claim).

318.   Ford is a "person, firm, corporation or association" within the

meaning of Wis. Stat. § 100.18(1).

319.   Plaintiff is a member of "the public" within the meaning of Wis. Stat.

§ 100.18(1). Plaintiff purchased or leased one or more of the Stall/Fire Risk

Vehicles.

320.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA")

prohibits a "representation or statement of fact which is untrue, deceptive or

misleading." Wis. Stat. § 100.18(1). Ford participated in misleading, false, or

deceptive acts that violated the Wisconsin DTPA. By systematically concealing the

defects in the Stall/Fire Risk Vehicles, and concealing the true nature of the July

- 111 -

2022 Recall "fix," Ford engaged in deceptive business practices prohibited by the Wisconsin DTPA, including: (1) representing that the Stall/Fire Risk Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Stall/Fire Risk Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Stall/Fire Risk Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

321.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

322.   In the course of its business, Ford concealed the Spontaneous Stall/Fire Risk in the Stall/Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Stall/Fire Risk Vehicles.

323.   By failing to disclose and by actively concealing the Spontaneous Stall/Fire Risk in the Stall/Fire Risk Vehicles, which it marketed as safe, reliable,

of high quality, and fit for use as hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the Wisconsin DTPA.

324.   In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Stall/Fire Risk Vehicles.

325.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

326.   Ford intentionally and knowingly misrepresented material facts regarding the Stall/Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

327.   Ford knew or should have known that its conduct violated the Wisconsin DTPA.

328.   As alleged above, Ford made material statements about the safety and reliability of the Stall/Fire Risk Vehicles when operating as hybrid electric vehicles that were either false or misleading.

329.   Ford owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Stall/Fire Risk Vehicles because Ford:

        a.     Possessed exclusive knowledge about the Spontaneous Stall/Fire Risk;

b.     Intentionally concealed the foregoing from Plaintiff and the Subclass;

c.     Made incomplete representations about the safety and reliability of the Stall/Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

d.     Knew that the July 2022 Recall fix would do nothing to address the engine manufacturing defect that was causing blown engines and the Stall/Fire Risk; and/or

e.     Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

330.   Because Ford fraudulently concealed the Spontaneous Stall/Fire Risk, as well as the true nature of the Stall/Fire Risk Vehicles, Plaintiffs were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiffs been aware of the defects in their vehicles, they would have either not have bought or leased their Stall/Fire Risk Vehicles or would have paid less for them.

331.   Ford's concealment of the defects in the Stall/Fire Risk Vehicles was material to Plaintiff and the Subclass.

332.   Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose Spontaneous Stall/Fire Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

333.   Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer any fix for the Stall/Fire Risk Vehicles. Ford's unlawful acts and practices complained of herein affect the public interest.

334.   As a direct and proximate result of Ford's violations of the Wisconsin DTPA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

335.   Plaintiff is entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because Ford's conduct was committed knowingly and/or intentionally, Plaintiff is entitled to treble damages.

336.   Plaintiff and the Subclass also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Wisconsin DTPA.

337.   Plaintiff and the Subclass also seek punitive damages against Ford because Ford's conduct evidences an extreme deviation from reasonable standards. Ford flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of the Stall/Fire Risk Vehicles, misrepresented the efficacy of the July 2022 Recall, deceived Plaintiff and the Subclass on life-or-death matters, concealed material facts that only it knew, and repeatedly promised Plaintiff and

the Subclass that the Stall/Fire Risk Vehicles were safe. Ford's unlawful conduct

constitutes malice, oppression, and fraud warranting punitive damages.

**COUNT XIII**

**BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER WISCONSIN LAW
(Wis. Stat. § 402.314 and 411.212)**

**(Alleged by Plaintiff Simmons on behalf of the Wisconsin Subclass)**

338.   Plaintiff and the Wisconsin Subclass reallege and incorporate by

reference all paragraphs as though fully set forth herein.

339.   Plaintiff brings this action on behalf of himself and the Wisconsin

Subclass.

340.   Under Wisconsin law, an implied warranty of merchantability

attaches to the Stall/Fire Risk Vehicles.

341.   The Stall/Fire Risk Vehicles were not merchantable when sold or

leased because their engines are prone to blowing and ejecting internal

components, flammable liquids and flammable vapors into the engine

compartment where they can ignite, and pose an unreasonable risk of spontaneous

stall and fire due to the Spontaneous Stall/Fire Risk as described herein. Without

limitation, the Stall/Fire Risk Vehicles share a common defect in that they are all

equipped with engines that were manufacturing with defects that make the vehicles

susceptible to a risk of spontaneous stall and combustion, causing an unreasonable

- 116 -

risk of death, serious bodily harm and/or property damage to lessees and owners of the Stall/Fire Risk Vehicles as well as their homes, passengers and bystanders. This defect renders the Stall/Fire Risk Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

342.    Plaintiff and the other Wisconsin Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Stall/Fire Risk Vehicles to Plaintiff and Wisconsin Subclass members.

343.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the other Wisconsin Subclass members have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State-specific Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.    Certification of the proposed Nationwide Class and State-specific Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.    Restitution, including at the election of Nationwide Class and State-specific Subclass members, recovery of the purchase price of their Stall/Fire Risk Vehicles, or the overpayment for their vehicles;

C.     Damages, costs, and disgorgement in an amount to be determined at trial;

D.     An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees;

F.     An order enjoining Ford's deceptive acts or practices; and

G.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: August 8, 2023                    Respectfully Submitted,

*/s/ Steve W. Berman*
Steve W. Berman
Thomas E. Loeser
Abigail D. Pershing
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com
abigailp@hbsslaw.com

Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

*Attorneys for Plaintiffs*